ANTHONY W. O'CONNELL v. THE STATE.

The Statute provides that in case of conviction before the District Court, in any criminal case, and an appeal taken therefrom, the judgment of the District Court shall be entered in accordance with the verdict, but no sentence of execution shall be pronounced by said Court.

Also, that the Supreme Court, in case the judgment of the District Court be affirmed, shall direct such sentence to be pronounced by the District Court, as is directed by law, and such as the District Court might have pronounced in case no appeal had been taken.

Appellant was tried for murder at a Term of the District Court, in September, 1855, and there was a verdict of guilty of murder in the first degree; motion for new trial overruled, and notice of appeal; in March, 1856, the Supreme Court dismissed the appeal for want of jurisdiction, there being no judgment of conviction in the District Court; the mandate of the Supreme Court was filed in the District Court in March, 1856; at a Term of the District Court, in December, 1856, the prisoner moved to be discharged on the ground that more than a year had elapsed since the verdict and before the commencement of the present Term, and that a regular Term of the Court had since intervened; motion overruled and judgment entered on the verdict; held, on appeal, that it was competent thus for the Court to supply the omission to enter judgment on the verdict at the proper time. (There are two Terms of the District

Court, and one of the Supreme Court in each year, and the time of holding the Fall or winter Term of the District Court, had been changed.)

It would seem that the mere omission to give the law fully in charge to the jury, where particular instructions have not been asked, is not error.

In a trial for murder, it is proper for the Court to charge the jury that if they believe from the evidence that the defendant inflicted the mortal wound, they should find him guilty of murder, unless they find that—(here only those facts should be put, in justification, excuse or mitigation of the homicide, of which there is some evidence either in the circumstances of the killing as proved by the State, or in the testimony introduced by the defendant.)

Under the evidence, the homicide could not be less than murder in the first degree; and there was therefore no occasion to instruct the jury respecting the degrees of murder.

In a trial for murder, the killing may be proved to have taken place at any time before the finding of the indictment, either before or after the time charged.

Appeal from Calhoun. Tried below before the Hon. Fielding Jones.

Appellant was indicted at the Spring Term, 1855, for the murder of John Van Zile. The indictment charged that the mortal wound was given on the 20th of August, 1854, and that the death ensued on the 23d. At a Term of the Court begun and held on the 17th day of September, 1855, the case came on for trial, and the evidence was as follows :

Charles Cox, for the State, testified as follows : Sometime about the 5th day of September, A. D. 1854, just about a year ago, I went with Van Zile to O'Connell's room, and as we entered the room we saw O'Connell lying on his bed. Van Zile addressed him, saying, " O'Connell are you asleep ?" O'Connell said "No." Van Zile said, " Are you drunk ?" and O'Connell again answered " No." Van Zile then told O'Connell that he, Van Zile, had heard that O'Connell had threatened, at the dinner table, to throw a glass in the face of Mrs. Van Zile. O'Connell denied having done so, and said that any man that had told Van Zile so, was a d——d liar. Van Zile then told O'Connell that no man had told him so, but that ladies had told him so. O'Connell then said,

" I have no recollection of having said anything of the kind, and, if I did, I did not intend it; it never was my intention to insult a lady, and, if I have done so, I will go with you and make an apology to her for it." Van Zile then said that would be sufficient and satisfactory. Van Zile sat upon the bed and conversed with O'Connell for some time ; the conversation was carried on in a friendly manner. I was standing in the doorway when they were talking ; the doorway was only a few feet, some four or five, from the bed on which O'Connell was lying, and Van Zile sitting. O'Connell said to Van Zile, " Wait till I get my coat, and I will go with you ;" O'Connell then left the room and went down the stairway, and I followed with Van Zile ; the latter and I walking side by side. As we were going down the stairs Van Zile said, addressing O'Connell, " Well, Colonel, we sometimes get out of the way when we are a little tight but when we get sober it all comes right." O'Connell answering said " Yes," and turned in the alley way, and went into Kendrick's bar room through a doorway, leading from the alley directly into the bar room. Van Zile and I entered Kendrick's billiard room through another door leading from the alley way into that room, and passing on through the billiard room, we entered the bar room from the opposite side to that on which O'Connell entered. I then walked towards the front door of the bar room, and Van Zile turned toward the bar. Just as I left Van Zile, I heard O'Connell exclaim, " Now what do you want with me ? God damn you : now what do you want with me ?" or words to that effect ; I think those were the words. I turned immediately and saw O'Connell rushing out of his shop, which was just inside of the bar room, and whence there was a door, leading into the bar room, near that throug hwhich O'Connell entered, toward Van Zile with a knife in his hands. Just as I turned I saw Van Zile raise his cane, as if to ward off the thrust of the knife, saying as he did so, " You shant stick that knife into

me ;" but O'Connell was too quick for Van Zile, and, as he was uttering the words, O'Connell stabbed him, and then stabbed him again before I could prevent him. The whole occurrence took place very rapidly, and the words "now what do you want with me," were scarcely out of O'Connell's mouth before the knife was into Van Zile. I rushed forward as soon as I could and knocked O'Connell down with a chair; others then entered and put a stop to the affair, and secured O'Connell. Before they interfered, however, O'Connell had arisen, and was rushing towards me with his knife. O'Connell was still trying to cut Van Zile, after he had stabbed him the second time, when I struck him with a chair. I was with Van Zile from the time he was stabbed until he died; he died from the stabs he received from O'Connell. Van Zile was first carried into the billiard room and thence home. He did not fall at first, but staggered a little way and sat down. After he was stabbed, he said he knew he was killed, and frequently said he knew he must die, and told those around him that O'Connell's attack was wholly unexpected and that he did not expect any difficulty with O'Connell from his manner, or any thing that he said, until he rushed towards him with the knife; that he had neither said nor done anything to provoke the attack, and supposed that O'Connell had gore for his coat to go with him. I am certain that Van Zile did not strike at O'Connell with the cane, but only raised it to ward off the thrust of the knife, but the thrust came so quick that he could not ward it off. Van Zile did not raise the cane until O'Connell made the rush at him with the knife. I heard the knife strike the cane twice. The knife shown to me is very similar to the one used by O'Connell, but I did not see the handle of the knife at the time, and could not swear positively that this is the same knife. It was just such a blade. I think the cane shown me is the one used by Van Zile. I see cuts upon it similar to those made upon that cane, but they were fresh then. O'Connell first stabbed the knife in between Van Zile's lower rib on the

left side; and the second time he cut him on the arm. This all took place in the bar room of J. J. Kendrick, in the city of Lavaca, in the county of Calhoun. It took place about three o'clock in the afternoon, as near as I can recollect. It was about a year ago. Van Zile lived through the succeeding night and following day, but died sometime during the ensuing night, I think, about one or two o'clock.

Cross-examined. Went with Vanzile to O'Connel's room, because Vanzile asked me to go. Neither of us had any arms. Vanzile had nothing but his cane, which he usually carried, and I had nothing. The conversation between Van Zile and O'Connell was carried on in friendly tones, and there was nothing in the manner of either of them to indicate any disposition to fight. I do not recollect seeing Van Zile on that day, before he asked me to go with him. I was going down street the same way, that he was, when he told me what O'Connell had said to his wife, and said that he wanted to go and see him about it; that, if he had said it, he must have been drunk, as he could not believe that he would otherwise insult Mrs. Van Zile. No threats were made by either of us when we entered O'Connell's room. I stood in the doorway a few feet from them. I cannot tell exactly in what position, Van Zile held the cane when warding off the knife. It was all done in an instant. I am sure Van Zile did not strike O'Connell; was within a few feet of them; I heard the exclamation of O'Connell. I had just separated from Van Zile; I did strike O'Connell with a chair; I did so to prevent him from cutting Van Zile all to pieces; I did what I would do for any man, under similar circumstances. I am not related to Van Zile by blood or marriage; I saw the parties after the affair was over; I heard Kaufman ask O'Connell if he had stabbed Van Zile; he said "Yes, and would do it again, damn him," or words to that effect.

A. Savory, for the State testified as follows: I saw Van Zile killed; I saw the knife stuck into him; it was about a

year ago, I think ; it was about the fifth of September, but cannot be positive as to the date ; it was during the session of the Court at Victoria county ; I was keeping bar for Mr. J. J. Kendrick, and was doing something behind the bar when I saw O'Connell, Van Zile and Cox in front of the bar ; I was busy at the time and did not know how they entered the bar room, nor through which door they came ; I thought some of them came through the billiard room, but cannot be positive ; I heard O'Connell say, " Wait until I get my cap," or something of that sort, and then saw him enter his tailor shop, which was a little room inside of the bar room, and the door of which was in front of the bar ; just as O'Connell reached the door of his shop, he reached in, or stepped in and got his knife ; I think his knife was lying on a table near the door, and that he reached his hand in and picked it up ; just as he got hold of the knife he turned and rushed toward Van Zile, exclaiming, " Now what do you want with me, God damn you ; now damn you what do you want with me ?" or words to that effect, and, as he spoke the words, he stabbed the knife into Van Zile, who tried to fend off the blow, but did not strike O'Connell ; he did not do, or say, anything until O'Connell rushed towards him with the knife, when he tried to knock off the thrust of the knife with his cane. I think he only stabbed Van Zile once ; I think the cut on the arm was made by the same stab that cut him between the lower ribs on the left side. Van Zile died of the stabs received from O'Connell ; Cox rushed forward just after O'Connell stabbed Van Zile, and knocked O'Connell down with a chair, but he got up again and was making at Cox, when others interfered. This took place in the city of Lavaca in this county, Calhoun. I think the knife shown, is the one O'Connell used ; it was very similar ; the cane looks like the one Van Zile usually carried, it had just such a head.

Cross-examined : I am pretty old ; was in the battle of San Jacinto ; do not recollect of ever seeing the prisoner, O'Con-

nell, there. I am sure Van Zile did not strike O'Connell before he was stabbed ; I saw nothing to indicate any fight until I heard O'Connell and saw him rushing at Van Zile with the knife ; do not recollect who came in and interfered ; I think Mr. Hays came in. I think I could knock a man down with this cane, if I was angry with him, and had a fair blow at him. I cannot describe the precise position in which Van Zile held the cane ; I was very near to the parties and could see all that was going on. The door of the shop is very near to the bar, there are only some five or six feet between. I do not recollect from what door they came into the bar room.

J. B. Hays, for the State, testified as follows :

I did not see O'Connell stab Van Zile ; I was standing in front of Kendrick's bar room, waiting for the funeral of Mr. Jordon, who had been killed that morning, when my attention was attracted by a scuffle inside the bar room. On turning I saw the prisoner at the bar, Van Zile and Cox. Van Zile was striking O'Connell over the head with his cane and O'Connell was rushing towards him. Van Zile seemed to wince and dodge while striking, turning himself as O'Connell approached him ; they were very near together. I saw Cox strike O'Connell over the head with a chair. As soon as I turned I saw the scuffle ; I rushed in between the parties and separated them. I saw no knife. I am certain Van Zile struck O'Connell with his cane. The first thing that attracted my attention was the noise of the scuffle. Van Zile retreated as O'Connell approached him, and entered the barber shop on the opposite side of the room.

Cross-examined : Was standing on the banquet in the street, in front of Kendrick's bar-room. I think I was about thirty feet from where the parties were scuffling. I did not hear any cursing, or any such exclamation as, "now, God damn you, what do you want with me ?" I was not paying any attention to what was going on within, until I heard the noise of the scuffle. I think Van Zile was looking for a weapon in

the barber shop. I think that was what he retreated for. He said, "I have been stabbed to death, and I want to see it out." I did not see any knife in the hands of O'Connell. I did not see any knife until after the occurrence was over, when some one told me that that was the knife with which O'Connell stabbed Van Zile. I think I could have heard the exclamation of O'Connell from where I stood, if I had been paying attention. The chair, with which Cox struck O'Connell was a heavy office chair. The doors in front of Kendrick's are large folding doors, generally open; they were open that day.

Re-examined : O'Connell was between Van Zile and me when I first saw them ; Van Zile was near the counter and O'Connell on the side towards his tailor shop and between Van Zile and me.

Dr. W. H. Dallam, for the State testified as follows : I attended upon John Van Zile during his last illness. He died in September, 1854, of a wound inflicted by a knife, or some other sharp instrument ; he was wounded in two places ; one wound was between the lower ribs on the left side ; the other was a cut on the left arm, through to the bone. The wound in the side was mortal, but the other was not. He died of those wounds. I did not probe them, as I considered it dangerous ; the object being to stop the hemorrhage. The wounds could have been inflicted by a knife, such as the one shown me ; the wounds may have been inflicted by one or two strokes.

Cross-examined : The wound in the side was inclined ; it might have penetrated the heart and lungs, or it might not. A person can, for some little time after he has been stabbed through the heart or lungs, fight very vigorously, but not long. It is possible, but not probable, that a direct thrust with a knife, like the one shown me, made by a strong person in a passion, might not penetrate the heart and lungs in such a manner as utterly to disable the wounded person. I heard Van Zile speak of his having been stabbed by O'Connell ; after he had expressed his belief that he was going to die, he frequently al-

luded to the subject. I did not hear him say that he had struck O'Connell first, but, on the contrary, he always said that he did not expect the attack of O'Connell upon him. I did not probe the wound, nor do I know of any one who did ; it was dangerous to do so.

Re-examined : The wound had the appearance of being inclined. A wound, inflicted by a strong person in a passion, might not penetrate the heart and lungs, if warded or partly fended off by a cane or stick ; nor need it necessarily, if the party receiving it, shrinks away from it as it is inflicted. A thrust, made in that manner, by such a knife as the one shown me, need not necessarily cause instant death, nor incapacitate the wounded person from exerting considerable physical force for some time after receiving the wound ; but he could not do so very long. Van Zile told me that he and Cox had gone into O'Connell's room to make O'Connell apologize for some insults offered to Mrs. Van Zile ; that O'Connell had promptly offered to apologize, but asked Van Zile to wait until he could get his coat ; that they all went down the stairway together, O'Connell ahead, and he and Cox after. O'Connell entered the bar room through the door from the alley ; and that he and Cox went through the billiard room into the bar room ; that he, Van Zile, was just stepping up to the bar when O'Connell rushed upon him with a knife, and stabbed him ; that the attack was unexpected, and that he was unable to ward the thrust with his cane ; this he told me after he knew he was going to die.

The defendant did not call any witnesses :

The Court charged the jury, without request, as follows :

The case which you have under consideration is one of the gravest character, whether you look at it with reference to its consequences to the accused, or with reference to its influence upon the community at large. In view of these you should carefully, coolly, and dispassionately, without prejudice against the accused or partiality for him, find the facts of the case from

the testimony, which has been detailed before you ; you should then apply these facts to the law, which I shall give you, in finding your verdict.

1st. If you believe, from the evidence, that the accused inflicted the wound upon the deceased, of which he died, without any threats of an immediate attack on him (the accused) by the deceased, the offence would be murder in the first degree, and you should find him guilty of murder.

2d. But if you believe, from the evidence, that the deceased attacked the accused with such violence as to furnish reasonable grounds of belief that he intended to take his life, or do him great bodily harm, the accused would be justified.

3d. As a general rule, the law presumes malice from the very fact of deliberate killing, and all the circumstances of necessity or infirmity, which justify, excuse or extenuate the act, are to be proved by the prisoner, unless they arise out of the evidence against him.

4th. It was not necessary for the State to prove the accused was reasonable, or that the deceased was reasonable ; all these matters the law presumes, unless the contrary be shown, or made of defence by the accused.

5th. If you find the defendant guilty you can find him, under this indictment, guilty of murder in the first degree, murder in the second degree, or manslaughter. If you find him guilty of murder in the first degree, you should simply say " We, the jury, find the prisoner guilty of murder in the first degree." If you find him guilty of murder in the second degree, you will find and assess his punishment, in the penitentiary, for a period of not less than three, nor more than fifteen years. If you find him guilty of manslaughter, you should assess his punishment, in the penitentiary, at not less than one, nor more than ten years. If you find him not guilty, you will simply say so in your verdict.

Verdict of guilty of murder in the first degree, September 25th, 1855. Motion for a new trial overruled.

Final entry of that Term, as follows :

This cause came on to be heard, on the defendant's motion for a new trial, which being argued by counsel and understood by the Court, was overruled, to which ruling of the Court defendant by counsel, objected, and gave notice of appeal.

April 20th, 1856, the mandate of the Supreme Court was filed, showing that said appeal came before said Court on the 2rd day of March, 1856, and was dismissed for want of judgment on the verdict.

The next entry was of a motion for defendant, filed December 2nd, 1856, to be discharged, on the ground that over a year had elapsed since the verdict, and before the commencement of the present Term, and that a regular Term of the Court had intervened, wherefore the Court had no authority to render any judgment on said verdict.

At same Term, which had commenced December 1st, 1856, entry reciting the verdict of conviction, the appeal, mandate of the Supreme Court, motion of defendant to be discharged ; overruled the motion to be discharged, and on motion of the District Attorney entered judgment on the verdict as follows :

Wherefore it is ordered, adjudged and decreed by the Court that the verdict of the jury be approved, and that the prisoner be condemned to be hanged by the neck, until he is dead, and that he pay all costs, for which execution may issue. But inasmuch as the prisoner has entered an appeal to the Supreme Court of this State, the sentence of execution is delayed, until after the determination of this cause in said Court, and it is ordered that the prisoner be remanded to the county jail of Galveston county and be there safely kept, until further order from this Court.


*Seawell*, for appellant.

In this case it is respectfully submitted :
Vol. XVIII            23

First. That the charge of the Court is erroneous, and calculated to mislead the jury.

Second. That the verdict of the jury is excessive, and not supported by evidence or the law.

Third. That the Court below ought to have granted a new trial.

Fourth. The variance between the time stated in the indictment and the time proved, is fatal.

Fifth. The Court had no authority to pronounce judgment at December Term, 1856.

I.   The first charge of the Court (Transcript p. 21) is manifestly erroneous, for several reasons :

1st. The charge is based upon the erroneous assumption that, the homicide being proved, the killing, *prima facie* constituted murder in the first degree.   This is not the just presumption of law, as is well settled.   (See 13 Tex. R. 186–7 ; Wright, Ohio, R. 176–7 ; Id. p. 399, 400, 401 ; Id. p. 620–21–22–23 ; Wharton's Am. Cr. Law, (3d Ed.,) 493, and cases cited ; 2 Grat. R. 594–9 ; Wright, Ohio, R. 27–8 ; 2 Ashmead, Penn. R. 227 ; 1 Leigh, R. 598, 612 ; Wharton's Am. Cr. Law, (3d Ed.) 509–10.)

These cases establish the rule, that, where the homicide is proved to have been committed by the prisoner, (the accused,) the presumption is that the offence is that of murder in the second degree, and to constitute or raise the offence to the crime of murder in the first degree, there must be proof of express malice, or some other of the circumstances set out in the Statute.

2nd. The definition of murder in the first degree, as given in the charge of the Court, is essentially variant from the definition of that crime contained in the Statute (Hart. Dig. Art. 501) and is erroneous.

3d. In view of the evidence in the case, the charge of the Court was calculated to mislead the jury to the prejudice of the accused—as it supposed a state of fact which clearly existed, as shown by positive testimony in the case, and directed

the jury that, if they found such to be the fact, they must find the prisoner guilty of murder in the first degree. Such a charge, given under any circumstances, is well calculated to mislead the jury; and under the circumstances existing in this case, in the absence of any proper and intelligent definition of murder in any degree, it is impossible to believe but that the jury were in fact mislead by the charge of the Court. (10 Tex. R. 492--5.)

4th. The third charge of the Court alone has any reference to a deliberate killing; and even that appears to consider the fact of deliberate killing as already established.

Throughout the entire charge there appears no distinction drawn between any grades of homicide, except between the highest and excusable homicide; all intermediate grades being merged into the highest.

II. The verdict of the jury is believed to be excessive for these reasons:

1st. There is no evidence of express malice, which must be proved and will not be presumed. (13 Tex. R. 187; Wright's Ohio Rep. and Leigh's Rep. before cited.)

. There is nothing conveying the least idea of premeditated and deliberate malice. The only declaration or act of the prisoner which could, under any circumstances, conduce to this conclusion in any degree, being spoken in the heat of the affray, are not entitled to any weight whatever. (Wright's O. Rep. 399, 400.)

The testimony of Cox, the principal witness for the State, shows he is not without blame, and that he testified under strong inducements to represent the facts as much against the prisoner as possible, and thereby to exonerate himself. Besides, in almost every particular of his testimony, which he seemed to deem of importance, he stands contradicted, either by his own statement or the testimony of the other witnesses. See his evidence as to purpose, for which he went to O'Connell's room contradicted by the testimony of Doct. Dallam.

Testimony as to the striking with the stick, contradicted positively by testimony of Mr. Mayor Hays, and by implication in various particulars. Note the statements that the first thing he saw was O'Connell "rushing out of the shop," and at the same moment saw Van Zile raise his cane, and afterwards that the wound in the side was from the first blow given, and compare it with the testimony of Doctor Dallam of the direction of that blow. Strange, too, that he had no recollection of deceased having gone to the barber shop, or retreated across the room, fighting as he went. (See Mayor Hays's testimony.)

Mr. Savory was an old man, engaged at the time the affray commenced, and by his own showing not very observant of what was passing. The testimony of Mr. Hays, the witness, under all the circumstances most to be relied upon, shows at most nothing more than the killing in sudden brawl and in the heat of passion. That of Doctor Dallam, has, principally, reference to the character and effect of the wounds.

III. The verdict being, then, so clearly excessive in view of the evidence, it can only be considered as responsive to the erroneous charge of the Court, and should, therefore, have been set aside, and a new trial granted.

IV. The indictment charges the wound was inflicted the 20th day of August, 1854, and the death occurred the 23d day of the same month; on which the deceased, for all that appears, was alive and well, and altogether unhurt.

The compilers and elementary writers (some of them) lay down the rule that a variance between the time charged and that proved is not material, and cite many authorities in support of the rule. With the aid of a very extensive library, kindly opened to us in this city, we have been unable to find a single case, out of the large numbers cited by the compilers, where the rule was applied to evidence of time, that the act does not appear to have been committed before the time charged. (See Arch. Cr. Pl. 84, and notes; 1 Chitty's C. L., 223; 1 Phil. Ev. 514.) There is a case reported in this coun-

try (1 Gal. R. 387) where the variance in this respect was held fatal.

In reason the rule should be different. The record of an indictment and verdict could be pleaded in bar of any felony committed prior to the time charged in the indictment, but not for any committed subsequent to the time charged.

V. It was held by the Judges of England, that no alteration could be made in any proceeding of the Court, even of the most trivial character, until the Statute of Jeofails. This Statute was held not to extend to criminal proceedings. (Jacob's Law Dic., AMENDMENT ; Hamilton v. Boydon, 1 Mass. R. 51.) Nor did the Common Law rule.

The reason of the rule is that, at the Term all things which were done or ought to have been done, were in the breast of the Judge. But, after the Term had passed, the matter was passed from the breast of the Judge, and could not be supplied. (18 Maine Rep. *ubi post ;* see 1 Caines R. 9 ; 7 Id. 344--8 ; 19 Johns. R., Mechanics' Bank v. Mulhouse ; 1 Pick. R. 351-4 ; Hamilton v. Boyden, 1 Mass. R. 51 ; Duval v. Wells, 1 Har. & McH. 163.)

After the Statute of Joefails, the rule was, and is, that there must be something in the record to amend by. (Hall v. Williams, 1 Fairf. R. 278, and cases cited ; McDonald v. Watkins, 4 Ark. R. 624; and numerous cases there cited.)

And the rule established the position that what is done, or ought to have been done, was passed from the breast of the Judge, and could not be supplied except by the record.

A distinction is made in the authorities between rendering judgment, and causing the judgment before rendered to be entered *nunc pro tunc.* (18 Maine R. 183 ; 1 Fairf. *ubi sup.*)

The judgment is ordered to be entered on the supposition or presumption that the judgment had been rendered, at the trial Term, which was afterwards entered, and that the Court would not order a judgment to be entered *nunc pro tunc* which had

not been rendered at the proper time. (Inhabitants of Limerick, 18 Maine R. 183.)

That presumption, it is submitted, would hardly be permitted to prevail in a criminal or capital case.

Presumptions of law do not avail against life or liberty, but in favor thereof.

Be that as it may, the record in this case shows that no judgment was before rendered and expressly negatives the presumption.

The necessity for such a presumption is an argument to show that in consideration of the Judges the judgment must be pronounced at the trial Term.

And, if it appear affirmatively that no judgment was rendered, an equally fair presumption arises, that there was good cause known, in the breast of the Judge, why judgment should not be rendered.

This question is settled and put at rest in " The Inhabitants of Limerick," (18 Maine R. 183,) where it is adjudged among other things, that " if a defect in a record is occasioned by " an omission of the Court to render the proper judgment, or " to come to a conclusion upon the whole matter embraced in " the cause, such a defect, arising out of an incorrect, or a want " of judicial action, cannot be amended after the session has " closed, and the cause is no longer *sub judice*."

But if occasioned by a ministerial officer of the Court, may be amended, if any thing is in the record to amend by.

*Attorney General*, for appellee. I. The entry of judgment may be treated as an amendment of the record, or as judgment *nunc pro tunc ;* and in either view it was competent for the District Court to take such action. (14 Tex. R. 456 ; State v. King, 5 Ired. R. 203 ; 5 Ired. R. 12 ; 4 Dev. R. 492 ; 1 Id. 313.)

It was competent to enter judgment at a subsequent Term upon the verdict of a former, not by way of amendment but as

an original act, the natural and legitimate result of the former proceedings.   (2 Burrows, 722 ;  8 Bing. 29 ;  21 Eng. C. L. R. 433.)

There is no distinction as to practice at Common Law in cases of this description, between criminal prosecutions and civil suits.

II.  The instruction given by the Court, denominated the first charge, is free of objection.   It is a concise exposition of the law, strictly based upon the facts and sustained by adjudicated cases.   (State v. Jordan, 10 Tex. R. 492 ; State v. Lander, 12 Tex. R. 462.)

The second charge (if subject to objection at all) is more favorable to the defendant than could reasonably have been asked ; and I am unable to perceive any objection to the third.

III.   The verdict is well sustained by the evidence.   There is no conflict in the testimony, which is not the natural consequence of the difference in position and opportunity of the several witnesses.   The dying declarations accord with the other testimony.

IV.   There is no soundness in the objection raised by the fourth assignment of errors.   The general principle is too well settled, that a different time may be proved from that which is alleged, if it be some time anterior to the finding of the indictment.

WHEELER, J.  The appellant was convicted at the Fall Term of the Court, 1855.  After verdict, he moved the Court for a new trial.  His motion was overruled, and he appealed.  The case was returned to this Court at the last Term, and argued by counsel for the appellant, upon errors assigned in the judgment.  But on inspection of the record it was found that the District Court had omitted to cause the judgment to be entered upon the verdict, as required by the Statute ; and on the au-

thority of Burrell & Burns v. The State, decided at the same
Term, the appeal was dismissed, because of the omission to en-
ter judgment upon the verdict   At a subsequent Term of the
District Court,—the last Fall Term,—the Court perfected the
record, by causing the formal entry of judgment upon the ver-
dict.   This action of the Court is now assigned as error.

The entry of judgment in this case was in accordance with
a settled practice, which has been recognized by this Court in
numerous cases.   Where, as in this case, the Court has failed
to enter up judgment upon the verdict at the Term, but has
caused entry to be made at a subsequent Term, this Court has
uniformly entertained the appeal.   The first case which is re-
collected, was determined at the second Term of the Court,
and was, it is believed, the case of The Bank v. Simonton, re-
ported in the second volume of the Texas Reports.   The Court
had omitted the entry of judgment upon the verdict; and
there was a motion to dismiss the appeal on that ground.   The
appellant applied for a *certiorari* to perfect the record, which
was granted.   And, in answer to the *certiorari*, a transcript
of a judgment was returned which had been entered upon the
verdict at a subsequent Term, now for then.   This Court
thereupon overruled the motion to dismiss, and entertained the
appeal.   The report of the case does not contain the ruling
upon this point, for the reason, doubtless, that it was disposed
of without a written Opinion.   There have been many similar
cases since, in all of which there has uniformly been the same
ruling.   The point was fully and expressly decided in the case
of Johnson v. Smith, et al., (14 Tex. R. 412,) and the power
of the Court thus to enter up judgment upon a verdict after
the Term was maintained.   In that case there was a verdict
rendered for the defendants at the Spring Term of the Court,
1849.   Subsequently, at the Spring Term, 1853, on the mo-
tion of the plaintiff, the Court entered up judgment upon the
verdict, now for them.   A motion to dismiss the appeal was
overruled ; and we then observed, that the practice of thus en-

tering judgment had been of not unfrequent occurrence ; and had in more cases than one, received the sanction of this Court ; that appeals from judgments thus rendered, had invariably been entertained. The judgment, it was observed, has the same force and effect, as a judgment of the Court, as if the entry had been made at the proper time. The verdict decides the issues, and while it stands, conclusively determines the litigation. The judgment is the legal conclusion and consequence, which results from the verdict. If the entry of it at the time, is omittted by inadvertence of the Judge or the Clerk, there is nothing in principle, to prevent the Court from causing the entry to be made, in furtherance of justice, at a subsequent Term. It is allowed upon the principle, stated by the Supreme Court of North Carolina, that the Court has a right to amend the records of any preceding Term by inserting what had been omitted, either by the act of the Court or the Clerk. And a record so amended stands as if it had never been defective, or as if the entries had been made at the proper time. (5 Iredell, 12 ; State v. King, Id. 203.) The form of the entry cannot be material, so that it embodies the legal effect and consequence of the verdict. Although not so expressed, it is, in effect, the entry of judgment now for then. The legal effect is the same.

As respects the power of the Court thus to perfect the rerord, it can make no difference whether it be a civil or a criminal case ; and the right to exercise it in such a case cannot be otherwise considered than as the settled law of the Court.

But if it were an open question, there can be no doubt of the propriety of its exercise in a case like the present ; because it is evident, the entry of judgment, required by the Statute, upon appeal in a criminal case, is but a formal entry, and operative only for the purpose of enabling this Court to revise the case upon appeal ; and the judgment, for all other purposes, remains to be rendered or pronounced, after the decision upon the appeal. The language of the Statute is : " That in case

" of conviction before the District Court in any criminal case, " and an appeal taken therefrom, the judgment of the District " Court shall be entered in accordance with the verdict, but no " sentence of execution shall be pronounced by said Court." (Hart. Dig. Art. 473.) The judgment which is thus required to be " entered," is not to be carried into execution ; and consequently is not the judgment of the Court, or operative for any other purpose than the merely formal one of presenting the record complete in the appellate Court. The sentence, which is the judgment of the Court for all other purposes, remains to be pronounced after the disposition of the appeal. This is farther apparent from the provision of the 9th Section, as follows : " The Supreme Court, in case the judgment of the " District Court be affirmed, shall direct such sentence to be pro- " nounced by the District Court as is directed by law, and such " as the District Court might have pronounced in case no appeal " had been taken." (Hart. Dig. Art. 476.) So that really and in fact, the judgment which is to affect the party otherwise than beneficially, is not rendered or pronounced by the Court, until after the appeal has been disposed of. The previous entry of judgment is for the appellant, to enable him to prosecute his appeal. It is solely for his benefit that it is required to be entered. If not entered, and his appeal is dismissed, and thus finally disposed of, there is nothing to prevent the final sentence from being pronounced and carried into execution, For it is an undoubted principle of the Common Law, that where the rendition of judgment is delayed, or suspended by any legal means, as by motion for new trial, in arrest of judgment, appeal, or other proceeding, the judgment may be rendered when the suspensive proceeding has been determined. By the Common Law, " where parties are hung up by act of law, neither of them loses his rights, but eventually judgment may be " entered *nunc pro tunc*," (per Tindall, Ch. J. 8 Bing. 29, 21 Eng. Com. L. R. 431, 432.) The final sentence or judgment, having been suspended by the appeal, when that was disposed

of, there was nothing to prevent the Court from proceeding to render final judgment or sentence of execution ; and it was for the sole benefit of the appellant, that the formal entry of judgment upon the verdict was made now for then, to enable him to avail himself of his appeal.   This specification of error, therefore, is clearly untenable.

It remains to consider the errors assigned in the proceedings.

The error assigned in the charge of the Court, is, in substance, that it does not distinguish and define the degrees of murder.   But it must be observed that the mere omission to give instructions is not error.   The Court is not bound in any case to give instructions not asked for by the party.   If the charge of the Court was not satisfactory, it was the right of the defendant or his counsel to ask such instructions as he thought proper.   If he omitted to ask particular instructions, he cannot assign as error the omission of the Court to give them.   It is no objection to the charge of the Court, that it supposes the state of fact which the evidence showed really to exist, and deduced the legal conclusion applicable to such a state of fact.   That is precisely what every charge should do.   That is the design and purpose of giving instructions to the jury ; it is to inform them respecting the law applicable to the particular case in hand ; and the more exactly the charge is adapted to the very case, the more likely will the jury be to arrive at a correct conclusion in the application of the law to the fact.   Instruction beyond what the facts call for can never subserve any beneficial purpose ; and may mislead.   The charge should be framed and is to be considered in reference to the facts of the case.   And we are of opinion that there was nothing in the evidence in this case to call for an exposition of the law upon the degrees of murder.   There really is no conflict in the testimony.   The witnesses who testify to having seen the original assault, accord perfectly in their statements in every material particular ; and those whose attention was attracted by the noise, and who witnessed only what transpired

after the assault was begun, coincide in their statements, substantially in all that is material, with the other witnesses, as to what transpired afterwards. If the witnesses were entitled to credit,—and of that the jury were to judge,—it unquestionably was a premeditated and deliberate homicide, committed under circumstances which did not admit of any extenuation, mitigation or excuse; and, consequently, was murder in the first degree; under the evidence it could not be of a less degree; and there was therefore no occasion to instruct the jury respecting the degree of murder. The case of Shorter v. The People, determined by the Court of Appeals of New York, may be referred to as affording a very forcible practical illustration of this principle, if, indeed, it be not too obvious to n_ed illustration. The prisoner was convicted of murder, and sought a reversal of the judgment for error in the charge of the Court. But although there was error in the charge, yet as it was upon a doctrine of the law of homicide, on which the evidence in the case did not call for instructions, the Court of Appeals held it no ground for reversing the judgment. The question is thus treated in the Opinion of the Court by Judge Bronson :
" Although I cannot concur in that part of the charge to which
" exception was taken on the trial, it does not necessarily fol-
" low that we must reverse the judgment. The evidence did
" not make a case for laying down the law of justifiable homi-
" cide ; and an error of the Court concerning an abstract pro-
" position, having nothing to do with the matter in hand, is not
" a sufficient ground for reversing a judgment. If every con-
" troverted fact mentioned in the bill of exceptions, is taken in
" favor of the prisoner, the best case which he can possibly
" make will be substantially as follows :   There was a sudden
" combat between the parties in the night, in which the de-
" ceased gave the first blow ; but the prisoner entered readily
" into the fight.   The deceased had no weapon, and gave blows
" with his naked hands or fists, while the prisoner struck with
" a knife, inflicting not less than nine wounds, one or more of

" which were mortal. After several blows had passed, the " deceased hallooed, ' he has got a knife,' and retreated towards " the middle of the street. The prisoner followed and contin- " ued to give blows ; the deceased, at the same time, either " giving blows or defending himself against those given by the " prisoner. The prisoner did not leave the side walk.

" the deceased got to the middle of the road, he cried out, ' oh, " boys,' fell, and died in a few minutes. The prisoner did no- " thing to shun the combat, nor did he show any disposition to " stop the fight after it had commenced. Although one witness " thought the deceased had the better of the fight at first, no " important advantage was gained over the prisoner ; he was " neither knocked down, nor seriously injured, nor was he in " any danger of life or limb. He followed when the deceased " tried to escape, still giving blows with a deadly weapon, until " very near the moment when the deceased fell down and ex- " pired. This (the Judge continues) is the most favorable case " for the prisoner, which can be drawn from the facts detailed " in the bill of exceptions ; and much more favorable than any " intelligent jury would draw from the whole of the evidence. " But taking the case as I have stated it, there is no color for " calling it justifiable homicide, or for leaving any such ques- " tion to the jury. If it was not murder, it was manslaughter " at the least ; and so far as relates to these offences, no excep- " tion was taken to the charge." The Judge here observes : " When a man is struck with the naked hand, and has no rea- " son to apprehend a design to do him great bodily harm, he " must not return the blow with a dangerous weapon. After a " conflict has commenced, he must quit it, if he can do so in " safety, before he kills his adversary ; and I hardly need add, " that if his adversary try to escape, he must not pursue, and " give him fatal blows with a deadly weapon." The Judge thus concludes : " As there was no question of justifiable ho- " micide in the case, the prisoner had no right to call on the " Court to instruct the jury on that subject ; and although the

" instruction given was wrong in point of law, I do not see how " it can possibly have operated to the prejudice of the prison- " er. As this is a criminal and a capital case, I cannot but feel " a strong disposition to give the prisoner a new trial. But the " law concerning bills of exceptions is the same in criminal as " in civil cases, (The People v. Wiley, 3 Hill, 194, 214,) and " we must not suffer our feelings to draw us into a bad prece- " dent." And the judgment was affirmed by the unanimous opinion of the Court. (2 Comstock R. 193, 202, 203.)

If in the facts of this case there was no color for a charge upon the law of justifiable homicide, or for leaving any such question to the jury, and even an erroneous charge upon that subject was no ground for reversing the judgment ; most cer- tainly there was nothing in the facts or evidence in the present case, calling for a charge upon the law concerning the degrees of murder ; and the mere omission of the Court to charge upon that subject cannot afford a ground for reversing the judg- ment.

Finally, there is no precedent or authority for any such dis- tinction as that sought to be maintained by the counsel for the appellant, that the homicide may be proved to have been com- mitted before, but not after the time charged in the indictment as applicable to such a case. " The time of the commission of " an offence laid in the indictment is not material, and does not " confine the proof within the limits of that period ; the indict- " ment will be satisfied by proof of the offence on any day ante- " rior to the finding." (Whart. Am. Cr. L. 220.) There are several exceptions to the rule ; but the present case is not within them. One exception is, where any time stated in an indictment is to be proved by a matter of record ; there a va- riance will be fatal. Thus, in an indictment for perjury, the day on which the perjury was committed must be truly laid. (Ibid.) That was the case cited by counsel from 1 Gallison's Rep. 387. It has no application to the present case. The general rule, as above stated, has always been held in refer-

ence to the time when a homicide is alleged to have been committed. It may be proved to have taken place at any time previous to the finding of the indictment.

There is no error in the judgment, and it must, therefore, be affirmed.

Judgment affirmed.