[No. 2727.]

## WALTER BODDY *v.* THE STATE.

1. MURDER—SELF-DEFENSE—CHARGE OF THE COURT.—The law of self-defense, when invoked by the proof, should be given to the jury in plain and intelligible language, without superfluous verbiage. Learned abstractions are not the means best calculated to make it comprehensible by the jury.

2. SAME—CASE STATED.—In a trial for murder, it was in proof that the killing was the culminating incident of a quarrel between the deceased and the defendant, and there was evidence that when the fatal shot was fired by the latter the deceased was advancing upon him in a meancing manner, and was extending his hand towards a butcher knife lying on a table which stood near the parties. In effect, the charge of the court instructed the jury that such movements of the deceased, if proved, amounted to no more than mere acts of preparation, and could not avail as a defense. *Held,* erroneous. The rule applicable to the evidence was that prescribed by the Penal Code in section 2 of Article 570, and the charge of the court was calculated to convince the jury that the conduct of the deceased could not warrant apprehension by the defendant of the loss of his life, or of some serious bodily harm.

3. CHARGE OF THE COURT.—The design of instructions to the jury is to inform them respecting the law applicable to the particular case on trial, and the more exactly the charge of the court is adapted to the very case on trial, the more liable will the jury be to arrive at a correct verdict.

APPEAL from the District Court of Kinney. Tried below before the Hon. T. M. Paschal.

Upon an indictment charging the appellant with the murder of Charles Burns, by shooting him with a pistol, on December 31, 1882, the appellant was found guilty of murder in the second degree, and a term of fifteen years in the penitentiary was assessed as his punishment.

The homicide occurred at Fort Clark, a military post of the United States, located close to the town of Brackett, the county seat of Kinney county. The parties to the homicide, and the witnesses to the attendant circumstances, appear to have been freedmen in the employ of the military authorities, or their familiars.

John Brown was the first witness introduced by the State. He testified that he knew the defendant, and was acquainted with the deceased in his life time. The witness was present when the deceased was killed by the defendant, in the house of Thomas Jefferson, in the town of Fort Clark, on the morning of December 31, 1882. At about seven o'clock on that morning, the witness and Thomas Jefferson were standing near the stove in Jefferson's house, when the defendant came in with his head bandaged up. The witness remarked to the defendant: "It seems that somebody has been getting into your upper story." He replied: "Yes, but I will get even." A few minutes later the deceased came in and said, "Good morning." The witness and Jefferson returned a like greeting, but the defendant made no reply. In a short time the deceased remarked: "It seems there is some d——d man in this house who don't want to speak to me." To this the defendant replied: "By Jesus Christ, mister, I understand you have been telling that woman some tales on me, and caused her to hit me on the head with a bottle." The deceased said: "Yes, I did tell it. Don't you like it?" Thereupon the defendant, with his hands in his overcoat breast pockets, took three steps forward, faced the deceased, and said: "I don't like it." The deceased retorted, "Help yourself," and started towards the defendant, when the defendant, with a quick motion, drew a pistol from his overcoat pocket and fired, and the de-

HI1

ceased fell dead. The defendant took a step towards the deceased after he fell, and presented his pistol again, but did not fire. He looked at the body, and turned away.

On cross-examination, the witness said that there was a large butcher knife lying on a table which stood between the parties, and when the deceased started towards the defendant he had his hand extended towards the knife. Witness could not say that the deceased intended to get the knife or that he intended to use it. The defendant had his hands in his overcoat pockets when he stepped out from the stove, but he did not draw his pistol until the deceased started towards him. The movements of the deceased when he stepped towards the defendant with his hand extended towards the knife were quick. He dodged when the defendant drew his pistol, and in doing so presented the side of his head towards the defendant. He said nothing after the pistol was drawn, but fell dead at the side of the table when the pistol fired. In order to reach the defendant from where he was, the deceased would have had to pass the table on which the knife lay.

Stephen Gaddy, a government employe, was the next witness introduced by the State. He testified that early on the morning of December 31, 1882, he was informed that the deceased had just been shot and killed at the house of Thomas Jefferson. Witness went to Jefferson's house and saw the body of the deceased. He was quite dead, a ball having passed entirely through the head from the side, entering a little in front of the left ear and escaping through the right ear. The witness was one of the coroner's jury, and heard the witnesses testify. The testimony of John Brown on that occasion was substantially the same as his testimony on the trial.

Thomas Jefferson was the first witness for the defendant. He testified that the deceased was killed at his house on the morning of December 31, 1882, at about seven o'clock. The witness, defendant and John Brown were standing near a stove in one of the rooms of the house when the deceased came in on that morning and said, "Good morning." Brown and the witness responded to the salutation, but the defendant said nothing. The deceased took a position near Brown. Brown's position was then between the witness and the deceased, and the witness's between Brown and the defendant. A few moments after taking the position described, the deceased said: "It seems that there is some d—d man in this house who don't want to speak to me."

The defendant replied: "Mister, you ought not to want me to speak to you after telling that woman those tales, and causing her to mop my head up. At least I understand that you did." The defendant at this time was standing with his hands in his overcoat breast pockets. The deceased replied: "Yes, I did tell her; don't you like it?" Thereupon the defendant took about three steps, facing the deceased, and said: " No, I don't like it." The deceased made a quick movement towards the defendant, at the same time reaching out his hand towards a butcher knife which lay on a table standing near, and the defendant quickly drew his pistol and fired, and the deceased fell dead.

The deceased was shot after he made the movement towards the knife, but before he had time to get it. It was a large butcher knife used for cutting meat and hacking steaks. When the deceased fell, the defendant looked at him a moment and then turned and went into another room. When he returned to the room in which the shooting occurred, the witness said to him: "Walter, look what you have done. You ought not to have done this in my house. You ought to have finished where you commenced." He replied: "Well, he would not let me alone." Witness then told the defendant that he would have to consider himself under arrest, and the defendant replied that he was ready to go with the witness, and the two started to the jail. On the way to the jail the defendant told the witness that he had put the pistol under the head of a bed, in the second room in the house. Witness found it there after he had delivered the defendant to the sheriff and returned. The defendant at no time made any effort to escape.

The defendant slept at the witness's house on the night preceding the killing. The witness met him that night in the town of Brackett, and he asked the witness if he could not stay at witness's house until he got better; that he did not like to wait on the table at the house where he was working with his head battered up as it was. The witness told him that he could stay at his house as he requested, and the two left the California Exchange saloon, going to the house at about nine o'clock p. m. En route witness told the defendant that he must behave at the house and not have a row with the deceased, as the deceased was a boarder of his. The defendant replied that he had never intended to have a difficulty with the deceased, and had no such intention then; that he would let the deceased alone, if the de-

ceased would let him alone; that he was a stranger and wanted to avoid trouble.

Cross-examined, the witness said that he did not know who were the first persons to reach the house after the shooting, as he went immediately to Brackett with the defendant in custody. When the defendant told the deceased that he "ought not to want him to speak," etc., he did not appear to the witness to be angry or excited. When the deceased retorted in the language quoted above, the defendant appeared to the witness more like a frightened than like an angry man. The deceased reached his hand out towards the knife just as he started towards the defendant, but was shot before he could get it. The witness did not know positively that the deceased really intended to get the knife, or that he intended to use it on the defendant. The witness had been questioned about this killing by a great number of persons, and had talked about it to a great many, including the attorney for the defendant. He had never told the defendant how he would testify, and he had never told any one that the killing of the deceased was a cold blooded murder. The witness testified upon the inquest, and his statements then, concerning the knife, were the same as those he made upon this trial. The witness knew Mitchell Boddy, the defendant's father, who was in attendance upon this trial, though his acquaintance was of recent origin. The defendant did not fire upon the deceased until the latter made his quick forward movement, and reached towards the knife. He did not say, "I can help myself" and immediately fire. He did say "I can help myself," whereupon the deceased stepped rapidly forward and reached towards the knife, and it was then, and not till then, that the defendant drew his pistol and fired, quickly and without taking aim.

George McAmie was the next witness for the defense. He testified that he and the defendant were together on the streets of Brackett on the night preceding the killing, and while in company they met the deceased. The witness and the deceased spoke, and the deceased followed up the usual salutation with the inquiry: "Who is that you have with you?" The witness replied: "It is Mr. Walter Boddy." To this the deceased answered: "Well, I guess Mr. Walter Boddy has got a d——d good sore head, and it's good for him." The defendant replied to this: "That's all right, Burns." Witness walked on, calling to the defendant, who followed him, the two going to Charlie Williams's room and engaging in a game of cards. After play-

ing several games of "casino," the defendant threw down his hand, and said: "George, its d—d hard that Burns must keep after me about my sore head after me and everybody else has let it drop. It seems that he wants to get a fight out of me." Witness replied to him: "If I were you I would have nothing to do with Burns. You are a stranger here, and have no money to pay out in fines." The defendant said in reply: "I know that, but Burns ought to let me alone."

The witness then told the defendant about a conversation he had with the deceased the night after the woman struck the defendant with the bottle, which was about three nights before. He told him that the deceased said that he, the defendant, did not get enough; that he, the deceased, was backing that fight, and the defendant had better go slow about it; that if he ever caught the defendant making "that kind of a play at Hannah Young's" he would kill the defendant. Hannah Young was the woman who struck the defendant with the bottle. The defendant said in reply that he did not know what to do about the matter, but he wanted Burns to let him alone. Witness told the defendant that if he were the defendant he would give the deceased a good whipping and let that end the matter. The defendant replied: "I am a stranger here, without money to pay a fine; but I will let him alone if he will let me alone."

From Williams's room the witness and defendant now went to the California Exchange saloon, where they met Thomas Jefferson. Jefferson invited the defendant to go to his house for the night, and the defendant consented. Witness called the defendant aside and advised him not to go to Jefferson's house. Defendant asked why, and the witness told him that the deceased boarded there. The defendant replied: "Well, I won't have anything to do with him." Presently Jefferson and the defendant left together.

Cross-examined, the witness said that he and the deceased were good friends at one time, but were not the best of friends at the time of the killing. He had talked to the defendant through the jail bars several times, but never about his testimony in this case. Witness had told the defendant's counsel what his testimony would be, but no one else. The defendant did not tell the witness, while playing cards in Williams's room, that he intended to get even with the deceased, nor did he exhibit a pistol to the witness; nor did the witness know that he had a pistol or other weapon. The witness advised against the

defendant's going to Jefferson's house on the night spoken of, because he knew that the deceased boarded there, and he wanted to avert any possible chance of collision between the parties.

Lewis Linn was the next witness for the defense. He testified that he knew the deceased in his lifetime and remembered when he was killed. He was not acquainted with the defendant, but saw him several times prior to his arrest. On the night before he was killed, the deceased came to the house of the witness and knocked at the door. He wore a long ducking overcoat, under which he carried a gun which looked like a government carbine. The witness asked him what he was doing with the gun, and he replied: "I am looking for Walter Boddy." The witness told him that Boddy was not there; that he was the only person about the house, and invited him in. He went into the house, took off his overcoat, in which he wrapped the gun, and lay down on the bed. The witness went to sleep, and when he woke up the deceased was gone. He next heard of his death.

Cross-examined, the witness said that he was a government teamster. He was at work in the *corral* when he heard of the death of Burns, and remarked then that the deceased was at his house the night before, but witness then said nothing about the gun. The witness had never spoken to the defendant, and had no acquaintance with his father. He had never told the defendant's counsel how he would testify in this case. He had told Jefferson about it several times. The deceased did not say that he wanted to shoot or kill the defendant. In answer to the question: "What are you doing with that?" (the gun), he simply said: "I am looking for Walter Boddy."

Doctor W. R. Patrick testified, for the defense, that he knew the defendant and the deceased, and remembered the time of the homicide. Two or three nights before the killing, the defendant came to the drug store of the witness bleeding profusely from a contused wound on the head, just over one eye. It was a painful, but not a dangerous wound, such a one as could have been inflicted by a blow from a club or bottle. The witness sewed up the wound, bandaged the head, and the defendant left. He was under arrest when the witness next saw him.

The State recalled Thomas Jefferson, and put in evidence a subpœna showing that he had been summoned as a witness on behalf of the prosecution. In answer to questions propounded by the State, the witness testified that he did not, on or about the day of the killing, in the town of Brackett, say to Mr. Frit-

ter or in his presence that the killing of the deceased was a cold blooded murder, committed without provocation. He was a witness at the coroner's inquest, and testified to the effect that the deceased reached for the knife, exactly as he testified on this trial. The witness told Mr. Gaddy about the knife some time before this trial. His testimony at the inquest was taken down in writing and read over to him, when he made his cross mark for his signature, being unable to write his name. The witness did not remember that anything was said about the knife in the written testimony.

Cross-examined, the witness said that thirty or forty people were present at the inquest, creating more or less confusion. He knew the definition of "murder," and thus defined it: "It is when a man kills another, not in a fight; but waylays him, or kills him unbeknownst."

S. S. Fritter, for the State, testified, in rebuttal, that he was sheriff of Kinney county at the time of the homicide. While out under the "rule" he talked to the other State witnesses about this case, but did not tell what his testimony was going to be. The witness heard the testimony of Thomas Jefferson before he was sent out under the "rule." In the evening of the day of the killing the witness met Jefferson in Brackett, and asked him how the killing occurred. Jefferson replied: "It was a cold blooded murder, without cause or provocation."

Stephen Gaddy testified, for the State, that he had several conversations with Jefferson about the killing, but could not remember whether or not Jefferson said anything about the deceased reaching for a knife. The witness heard Jefferson's testimony before the inquest, but did not remember whether or not he spoke of the knife.

Justice of the peace F. M. Converse testified, for the State, that he presided at the inquest and reduced the testimony to writing. Thomas Jefferson said nothing in his testimony on that occasion about the deceased reaching for a knife. The witness read the testimony over to the witnesses before they signed or cross-marked it. None of them told him of corrections they desired made.

Cross-examined, the witness said that a great many persons were present at the inquest, but that no noise was made. The witness suffered somewhat from defective hearing. He could not say that he wrote down the testimony in the identical words used by the witnesses, but the substance and sense he did. It

was possible that some words were said that the witness did not hear, but he was certain that Jefferson said nothing about a knife; otherwise he would have heard it. He did not know that he could hear the word "knife" more readily than he could any other word.

That the verdict was not supported by the evidence, and that the charge of the court was erroneous in many particulars, were the grounds set up in the motion for a new trial, which was overruled, and this appeal prosecuted.

*W. R. Wallace* and *Ed. Halton,* for the appellant.

*J. H. Burts,* Assistant Attorney General, for the State.

HURT, JUDGE. This is a conviction for murder in the second degree, the punishment being assessed at fifteen years confinement in the penitentiary.

Charles Burns, the deceased, was shot and killed by appellant at the house of one Thomas Jefferson, on the morning of the thirtieth-first day of December, 1882. The persons present at the homicide were John Brown, Thomas Jefferson and the defendant.

John Brown testified, among other things, as follows: "I and Mr. Jefferson were standing by the stove about seven o'clock in the morning, when defendant came in where we were. I noticed that defendant had his head bandaged up, and that it was and had been bleeding, and I remarked: 'It seems that somebody has been getting in your upper story;' and he replied: 'Yes, but I'll get even.' Just after this, Burns came in and said 'good morning.' Myself and Mr. Jefferson replied 'good morning,' but Walter Boddy made no answer, and after a short time Burns says: 'It seems there's some damned man in this house who don't want to speak to me.' Then defendant said: 'By Jesus Christ, mister, I understand you have been telling that woman some tales on me, and caused her to hit me on the head with a bottle;' and Burns says: 'Yes, I did tell it; don't you like it?' Then Walter Boddy took three steps forward, and he had his hand in his overcoat breast pocket, and turned and faced Burns and said: 'I don't like it.' Then Burns says: 'Help yourself,' and started toward defendant, when defendant quickly drew his pistol out of his overcoat pocket and fired, and Burns fell dead. When Burns fell, defendant took a step towards him and

pointed his pistol towards Burns, but did not shoot again. He looked at him and turned away."    *    *    *    *

Cross-examined:

"There was a knife lying on a table almost between Boddy and Burns, and as Burns started towards defendant he, Burns, had his hand extended towards the knife. I don't know what he intended to do with the knife, or that he intended to get the knife; he simply had his hand extended towards it. This occurred in Kinney county, Texas.   *   *   *   Defendant had his hands in his overcoat pockets when he stepped out from the stove. The morning was rather cold—cold enough for one to wear an overcoat. Defendant never drew his pistol till Burns started towards him. The knife on the table was a butcher knife. Burns's manner was quick, and he was moving towards defendant with his hand extending towards the knife. He tried to dodge when defendant drew his pistol, and in doing so turned the side of his head to defendant. He never tried to run, and never spoke after defendant drew his pistol. I don't know what Burns wanted with the knife, nor do I know that he intended to get the knife; don't know how long defendant had his hands in his pockets. To get to defendant, Burns had to pass by the end of the table on which the knife was lying. He fell down dead by the table."

Thomas Jefferson, a witness for the defense, in regard to the facts immediately attending the homicide, testified as follows: "I know the defendant. I did know Charles Burns; he is dead; he was killed at my house about seven o'clock on the morning of thirty-first December, 1882. Myself, John Brown and defendant were standing by my stove in the post of Fort Clark, when Burns came in and said 'good morning,' and I and Brown answered 'good morning;' but defendant said nothing. Burns came and stood by Brown. Brown was between me and Burns, and I was between defendant and Brown. After a little while Burns said: 'It seems there is some damned man in this house who don't want to speak to me;' and defendant said: 'Mister, you ought not to want me to speak to you after telling that woman those tales and causing her to mob my head up—at least I understand you did.' At this time defendant was standing with his hands in his overcoat pockets this way (the witness illustrating by putting his hands in a crossed position over the breast). Burns replied: 'Yes, I did tell her; don't you like it?' Then defendant stepped out about three steps and turned and faced

Burns, and said: 'No, I don't like it;' and Burns says: 'Help
yourself;' and defendant said: 'I can help myself;' and Burns
made a quick start towards defendant, and at the same time
reached his hand for a knife lying on the table; and defendant
qu'ckly drew his pistol and fired, and Burns fell dead. He never
had time to get the knife. The knife was a large butcher knife,
used for cutting meat and hacking steak. When Burns fell de-
fendant looked at him, and turned away and went into another
room.     *     *     *     *     Defendant never fired his pistol
until deceased started towards him and reached out for the
knife. He did not say 'I can help myself,' and then immedi-
ately fire; but when he said 'I can help myself,' Burns made a
quick movement towards him and reached towards the knife at
the same time. Defendant then drew his pistol from his breast
pocket and fired; he fired quick, without taking aim. The pistol
looked like an army size Colt's six shooter. "     *     *     *

The State proved by other witnesses that this witness swore
before the jury of inquest and failed to mention the knife; and
by the sheriff that this witness, in speaking of the homicide,
termed it a "cold blooded murder."

Notwithstanding these apparent discrepancies, the testimony
of the only witnesses who saw the killing imperatively de-
manded of the court a charge upon the principles of law govern-
ing in cases of self-defense—not abstractly, but directly appli-
cable to the facts and circumstances tending to support this
defense. The learned judge below gave in charge to the jury,
bearing upon this subject, the following instructions:

"The law gives a man whose life or person is unlawfully
attacked by another the alternative of seeking the protection of
the government from the intended unlawful attack—assassina-
tion, or to abide the risk of protecting himself by his own arm.
If he should choose to adopt the method of protecting himself,
it is allowed him under the following conditions: That he must
have the patient watchfulness, courageous firmness, and reason-
able discretion to await the doing of some act by his antagonist
which is reasonably calculated to induce the belief, and does in-
duce the belief, that he is then in immediate and imminent
danger of losing his life or suffering some great bodily harm
from that which really is, or reasonably appears to be at the
time, the impending attack of his assailant. The law does not
fix upon what that act demonstrating the intention shall be;
still it must be some act which is reasonably calculated to induce

---

---

the belief, and does induce the belief, that the attack has then commenced to be there executed, and not a mere act of preparation to attack. The party who is thus assailed is not bound to retreat in order to avoid the necessity of killing his assailant.

"If the defendant was attacked by Charles Burns in such a manner that it produced in defendant's mind a reasonable expectation or fear of death, or of some serious bodily injury, and you so find or have a reasonable doubt thereof, you will acquit him.     *     *     *     *

"The law gives a man whose life or person is unlawfully attacked by another the alternative of seeking the protection of the government from the intended unlawful assassination."     *     *     *     *

What protection can the government render a man against assassination, if impending? "Or to abide the risk of protecting himself by his own arm." What risk must he abide? That of being assassinated by his adversary? or that of punishment at the hands of the government? If his adversary was in the act of inflicting, or had done some act showing an immediate intention to inflict, serious bodily harm, or to kill or assassinate defendant, no risk could be incurred by him in " protecting himself by his own arm," unless he had provoked the difficulty or produced the occasion with the intention of slaying his adversary, etc.

"If he should choose to adopt the method of protecting himself, it is allowed under the following conditions: That he must have the patient watchfulness, courageous firmness, and reasonable discretion to await the doing of some act by his antagonist which is reasonably calculated to induce the belief that he is then in immediate and imminent danger of losing his life, or suffering some great bodily harm."     *     *     *     Why cloud the plain legal principles of the law of self-defense with this disquisition, when a citizen is being tried for his life or liberty? These principles should be made eminently practical, and to accomplish this they should be stated in plain and simple language, stripped of all unnecessary verbiage, so as to be readily comprehended by the jury. We are of the opinion that these principles are so entangled within the maze of these learned observations as to render it very doubtful whether the jury understood the law applicable to self-defense.

"Still it must be some act which is reasonably calculated to

induce the belief, and does induce the belief, that the attack has then commenced to be then executed, and not a mere act of preparation to attack." "And not a mere act of preparation to attack." This, applied to the facts relied upon by defendant in support of his plea of self-defense, evidently was calculated to mislead the jury. While abstractly correct, it was made the instrument by which an error was committed as effectually as if done by a most vicious fallacy. In its effect the chief corner stone of the defense was crushed, and its structure made to crumble to dust. There was not a fact or a phantom of facts tending to show preparation by deceased, save that relating to the effort to seize the knife. What then was this charge most evidently calculated to do? Impress the jury with the belief that when Burns, the deceased, made a quick movement towards defendant, and reached towards the knife at the same time, he was only making preparation to bring on the attack. The rule upon this point is that the killing must take place while the person killed was in the act of committing the offense, or after some act done by him showing evidently an intent to commit such offense.

To come within this rule is it required that the party slain must have actual possession of the weapon with which the offense is to be committed? Could not an act be done, though one of preparation, which would show evidently an intent to commit the offense? Must, if a pistol be drawn, the adversary cock and present the same, to constitute such an act? To term the act of reaching for the knife, under the circumstances attending it, a "mere preparation," is a perversion of language as understood in legal phraseology, and it was, by thus terming it, calculated to induce the belief that such act was not sufficient to impress the defendant with reasonable apprehension of the loss of life, or of some serious bodily harm.

The law applicable to the defense of the appellant is not affirmatively given in this charge. In *O'Connell* v. *The State*, 18 Texas, 343, Justice Wheeler says: "It is no objection to the charge of the court that it supposes the state of fact which the evidence showed really to exist, and declared the legal conclusion applicable to such a state of fact. That is precisely what every charge should do. That is the design and purpose of giving instructions to the jury; it is to inform them respecting the law applicable to the particular case in hand, and the more exactly the charge is adapted to the very case, the more liable will

the jury be to arrive at a correct conclusion in the application of the law to the fact." (*Russell* v. *The State*, 18 Texas, 713; *Marshall* v. *The State*, 40 Texas, 200; *Lindsey* v. *The State*, 1 Texas Ct. App., 327; *Lopez* v. *The State*, 42 Texas, 298.)

Because of the errors in the charge, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 29, 1883