[No. 1389.]

## GEORGE HACKETT v. THE STATE.

1. PRACTICE—CONTINUANCE.—Complaint of the action of the trial court in refusing a continuance cannot be heard when it appears that the absent witness was present in court before the conclusion of the evidence.

2. SAME—EVIDENCE.—In order to avoid a postponement of the trial, an agreement was entered into between the State and the defendant authorizing the latter to read in evidence the testimony of the absent witness, as set forth in his application for a continuance. *Held*, that such agreement did not preclude the State from introducing the absent witness, if accessible before the conclusion of the evidence.

3. SAME—CHARGE OF THE COURT.—The rule laid down in *Skaro's* case (43 Texas, 88) is "that an admission that a witness, on account of whose absence a continuance is asked, would swear, if present, as stated in the affidavit for continuance, will not defeat the application." Such rule applies only where the defendant is legally entitled to a continuance; and hence, the defendant in this case was not injured by a charge which instructed the jury, in substance, that the written statement contained in the motion for continuance should be received, and given the same weight, and no more, as if the witness had been on the stand.

4. SAME.—The court, in a trial for murder, instructed the jury that it was for them to determine the facts from the evidence before them, "and, applying the facts thus ascertained to the law as above given you, it will be your duty to deduce the guilt or innocence of the defendant." *Held*, erroneous, inasmuch as the jury is required to believe the defendant innocent in order to acquit, and because repugnant to the rule which requires a verdict of not guilty, unless the State establishes the guilt of the defendant beyond a reasonable doubt. See the opinion *in extenso* for the question discussed.

5. SAME.—In charging the jury, it is the duty of the court to instruct on every phase of case made by the evidence.

6. SAME—SELF-DEFENSE.—It is a rule of practice that instructions should not be presented in the form of abstract propositions, but should be constructed upon the evidence in the particular case on trial. See the opinion *in extenso* for a charge of the court upon the subject of self-defense, *held* error, because not applicable to the evidence on that subject, and because it announces merely an abstract principle.

7. SAME—EVIDENCE.—See evidence in a murder trial which required of the court a charge on the subject of "cooling time."

APPEAL from the District Court of Washington. Tried below before the Hon. I. B. McFarland.

The indictment charged the appellant with the murder of Major Williams. His trial resulted in his conviction of murder in the first degree, and he was awarded the death penalty.

John McDade, a colored man, was the first witness presented by the State. He identified the defendant, testified that he knew the deceased, Major Williams, in his lifetime, and was present when the latter was killed by the former in Washington county, Texas, on the seventeenth of September, 1881. The parties were present at an entertainment at Jack Wilson's. The deceased was occupying a seat in the house, when Peter Petty entered and ordered him to surrender his seat, which the deceased refused to do, whereupon Petty spit in his face. The deceased got up, and Petty drew a pistol, but Andy Toms took the deceased out of the house.

After the deceased was taken from the house, the witness saw the defendant inside with a knife in his hand. He, the defendant, followed the deceased out of the house, and while the deceased and the witness were facing each other in the yard, the defendant came up, and asked the deceased if he cursed his, the defendant's, wife. To this inquiry the witness replied to the defendant that the deceased had not cursed his wife, and the deceased said that if he had cursed the defendant's wife, he, the deceased, "was man enough to stick to it;" thereupon, the defendant struck the deceased in the breast with a knife, and the deceased fell and died in a few minutes. The knife was about five inches long, the blade being two and a half inches in length.

After the stabbing, the defendant walked around the yard and said that he was "the best d—d man there." At the time he was stabbed, the deceased had his hands down by his side; he had no knife in his hands, and made no demonstration or motion to strike the defendant. The deceased was about eighteen years old and in good health when he was killed. Ann Hackett, the wife of the defendant, was walking around the yard with a pistol when the deceased was killed. The witness saw the wound on the body of the deceased at the inquest held on the day after the stabbing. The knife had penetrated the left breast near the nipple.

On his cross-examination the witness repeated substantially the account of the tragedy detailed in his examination in chief. He denied that he struck Pete Petty on the head that night, and said that he saw no other person strike Petty.

The house at which the party was given, and where the tragedy

was enacted, had two rooms, one being a shed room with a partition. The large room was about ten feet by twelve in size. The house had three doors, one of the doors being in the west end of the large room, and another in the partition. When Petty told the deceased to get up, the latter was seated on a bench on the north side of the large room. Mollie Randle and another girl were seated near him. The deceased fell back towards the door when the defendant struck him with the knife. He had one foot on the door step just before he fell. The witness was not drunk that night, but had taken two or three drinks. Byrd Kuykendall had liquor in the little room, and would give it away to any one who would buy candy from him. The witness denied that on the day before this trial he told Major Breedlove, of counsel for the defense, that Bettie Boulding was standing by him when the deceased was killed, but did tell Breedlove that Bettie Boulding said that she knew nothing about the killing. Willis Boulding was about the premises at the time of the killing, or at least the witness supposed so, as immediately afterwards he came up to the body. Eli Randon, the witness thought, was standing near the southwest corner of the house when the cutting was done. Byrd Kuykendall was standing very near the witness when the cutting occurred. Rachael McDade, the wife of the witness, was within ten feet of him. Henry and Jerry Mays stood within eight feet of the place when the killing occurred. The witness did not see the deceased have a knife at any time that night. He most positively had none in his hand when he was killed. The defendant took up for Peter Petty in the difficulty in the house which arose over Petty spitting in the face of the deceased. There was a light in the house and two torchlights in the yard at the time of the killing, one of them being held by Rachel McDade, the wife of the witness.

Still testifying on his cross-examination, the witness said that he saw the open blade of the knife in the defendant's hand before he struck the deceased. Witness did not attempt to prevent the defendant from cutting the deceased, because he was afraid of being cut himself. The defendant had his knife in his hand, down by his side, just before the cutting. The witness and his wife left the place and went home as soon as the deceased fell, did not stay until he died, which, he was informed, took place within five minutes. He was present at the inquest next morning. The witness was not drunk, and was positive in his declaration that his wife Rachel had a lighted lamp in her hand at

the time of the killing—as positive of that as of any other fact, and declared that if he was not correct in that statement, he was correct in nothing he had stated. He knew that the deceased and the defendant had been good friends, and did not know that they had ever had a previous disagreement.

Eli Randon, colored, was next introduced by the State. He testified that he was present and saw the stabbing. Just before it occurred, Pete Petty was running around the yard with a pistol in his hand, and the defendant was standing talking to the deceased in the yard with an open knife in his hand, holding it behind him with the blade pointing out. The witness took a light from some one in the door and looked to see whether it was a knife or a pistol. The deceased was doing nothing whatever when the defendant struck him in the breast with the knife. He had his hands down beside his body. After stabbing the deceased, the defendant walked off waving his knife and saying something. After he was cut, the deceased walked about his length and fell by the door of the house, where he expired in about three minutes. The witness remained with the body all night. The deceased was doing nothing at the time he was stabbed. He had no knife in his hand, nor did the witness find one about his person afterwards. The wife of the defendant was on the premises, declaring that she would blow a hole through any one who interfered with the defendant. Prior to the killing the defendant was walking around, mad at and cursing the deceased, and was cursing him when he inflicted the wound.

On his cross-examination, the witness stated that he was in the house when the difficulty took place between the deceased and Pete Petty. The deceased and the defendant had a slight misunderstanding or quarrel in the house, which did not amount to much. At the time the deceased "went for" Petty, the defendant took hold of him, the deceased. Andy Toms and the deceased, the witness thought, went out of the house first, the defendant following. The witness went out after them, to quiet the row if he could. Petty was walking about the yard cursing, and was standing, as near as the witness could tell, about six feet from the northwest corner of the house, when the killing took place. Bettie Boulding was at the house that night. The witness saw Rachel McDade there, but saw nothing in her hands.

Andy Toms, for the State, gave substantially the same ac-

count of the killing as that given by John McDade. He added that when the deceased and Petty got into the difficulty in the house, he, witness, took the deceased out of the house, but the deceased returned, and the witness did not know whether the deceased or the defendant came out of the house first the second time. The deceased quarreled with no one when he went back into the house, so far as the witness knew. The deceased and the defendant had hold of each other in the house, but that row did not amount to much.

On his cross-examination, the witness stated that he did not know that the defendant took hold of the deceased to prevent Pete Petty from assaulting him. The defendant had hold of the deceased's hand when the witness started out of the room with the latter. But few minutes elapsed between the dispute in the house and the cutting. After the cutting the defendant went around the corner of the house, waving his knife and saying, "What a G—d d—d good man I is!"

Rachel McDade testified, for the State, that she was standing near her husband, John McDade, when the cutting took place. The defendant approached the deceased and said, "Take it back!" The deceased replied, "By G—d, you can't make me take it back!" whereupon the defendant stabbed him. After cutting the deceased the defendant ran to his horse, calling to his wife to come on. The witness had no lamp in her hand.

Cross-examined, the witness stated that she stood in front of the deceased when he was stabbed. She did not see the difficulty in the house. Just about or near the time of the cutting some one brought a lamp out near the parties and placed it on the ground. The witness picked it up and put it in the door. "If any body says I had a lamp in my hand he tells a yarn!" The witness went off home when the deceased fell.

Other testimony introduced by the State harmonized in every particular with that recited—all concurring in the declaration that the deceased exhibited no knife, and that none was found about him after his death.

For the defense, Andrew Harris testified ·that he saw nothing of the killing. He detailed the difficulty in the house between Petty and the deceased, and declared that, as soon as that started, the deceased and the defendant went to fighting. Thereupon the witness left, going home, and witnessed none of the after occurrences.

Wash. Pleasants, for the defense, stated that upon the com-

mencement of the difficulty between the deceased and Petty in the house, prior to the cutting, the deceased and the defendant became involved in a fight without exchanging a word. They passed one blow and clinched. He next saw the defendant and a number of others going out of the door.

W. Ward, for the defense, described the row between the deceased and Petty in the house. He did not see the defendant and the deceased in a row in the house. He stated that the defendant went out of the house in advance of the deceased.

The opinion sets out the statement of Bettie Boulding as it appears in the defendant's application for a continuance, and which was read in evidence.

The defendant's motion for a new trial raised the questions involved in the rulings of this court.

*McAdoo & Vinson,* and *Breedlove & Ewing,* for appellant.

*J. H. Burts,* Assistant Attorney General, and *F. D. Jadon,* for the State.

HURT J.  George Hackett was tried and convicted for murder of the first degree, and his punishment assessed at death.

We will consider the assignments of error in the order presented in the brief of the appellant, except those relating to the charge of the court, which will be considered last. The first error assigned relates to the overruling of the defendant's application for a continuance. In regard to this matter, there was no error of which the defendant can complain, the witness Bettie Boulding being present in court before the evidence was concluded.

The seventh assignment of error is, that " the court erred in overruling the defendant's motion for new trial; 1, on acount of newly discovered evidence; 2, in that the court allowed the State to introduce Bettie Boulding on the stand, in the face of the written agreement to read the statement of what her testimony would be."

With regard to the last ground in this assignment, we are informed by the record that the defendant had not been served with a copy of the *venire facias,* and that the cause was about to be postponed, when a written agreement was entered into by the defendant and the county attorney to the effect that the defendant would announce with the right to read to the jury, as

evidence, the testimony of Bettie Boulding as set forth in the defendant's motion for continuance.

There was nothing in this agreement which inhibited the county attorney from introducing the witness, if her presence could be had. Certainly the defendant could not be heard to complain of the introduction of a witness who, according to his oath, would swear to such a perfect defense to the charge pending against him. If this motion for continuance was made in good faith, the introduction of this witness would have been heard with perfect satisfaction. We are of the opinion that, notwithstanding the agreement, the county attorney had the right to introduce and examine the witness Bettie Boulding. This, however, was not allowed when the defendant objected.

Counsel for the defendant assigns as error the charge of the court which relates to the evidence of this witness. The charge was, in substance, that the written statement contained in the motion for continuance should be received and given the same weight, and no more, as if she had been on the witness stand. Counsel insists that the rule stated in *Skaro* v. *The State*, 43 Texas, 88, is in point. The rule there stated is "that an admission that a witness, on account of whose absence a continuance is asked, would swear, if present, as stated in the affidavit for continuance, will not defeat the application." If the defendant in the case in hand had been legally entitled to a continuance, the above rule would apply; but, as he was not injured in this matter (the witness Bettie Boulding appearing in time to be used as a witness), the rule has no application whatever.

We will now consider the charge of the court, in which we think there is error. In the twelfth subdivision of the charge the court instructed the jury as follows:

"It is for the jury to determine the facts from the evidence before them, and applying the facts thus ascertained to the law as above given you, it will be your duty to deduce the guilt or innocence of the defendant," etc.

Deduce the innocence of the defendant! Mr. Webster says that "deduce" means "to derive by logical process; to obtain or arrive at as the result of reasoning; to infer." Reasoning is nothing but the faculty of *deducing* unknown truths from principles already known.

To justify an acquittal, must the innocence of the defendant be deduced, reasoned out, or inferred, by applying the facts ascertained to the law as given by the court?

It is well settled in criminal law that the jury need not believe the defendant innocent in order to acquit. The State asserts an affirmative proposition, which is the guilt of the defendant, and the jury must acquit by finding not guilty unless the State establishes this proposition beyond a reasonable doubt. If the jury are required to deduce the guilt or innocence of the defendant from the law and evidence (under a rule of criminal law), they would be placed in a very perplexing and inconsistent condition. The rule of criminal law referred to requires the jury to believe from the law and evidence that the party is guilty beyond a reasonable doubt, before they will be warranted in law to convict. The jury may believe him guilty; this belief will not suffice unless from the law and evidence they are satisfied of his guilt beyond a reasonable doubt; and if not so satisfied they, under the law, must acquit by finding him not guilty. They are not required to believe him innocent. The verdict of not guilty is simply, in effect, to deny that the State has established the affirmative proposition, which is the guilt of the defendant, beyond a reasonable doubt; and is not a declaration of innocence. The jurors may believe him guilty, but can not, because of doubt, convict. Under this charge they can not acquit because they believe him guilty. They have deduced his guilt, but not beyond a reasonable doubt, hence can not convict. They have not deduced his innocence; hence under this charge they can not acquit.

We are of the opinion that this charge is erroneous, and is in direct conflict with the rule that the person is presumed innocent until his guilt is established beyond a reasonable doubt.

We are of the opinion that the law was not applied to the theory of the case presented by the evidence of the witness Bettie Boulding. The facts expected to be proved by this witness, as found in the motion for continuance and by agreement read to the jury, are as follows: "That she was present at the time of the difficulty. That Major Williams struck the defendant in the house without any provocation whatever, and also drew an open knife on the defendant and tried to cut him with the knife; and that the defendant, to keep Williams from cutting him, ran out of the house; and that Williams immediately followed the defendant out of the house into the yard with an open knife in his hand, and was trying to cut the defendant with the knife; and that two or three persons were assisting Williams in his efforts to get to defendant with the knife; that Williams was

mad and cursing the defendant; that, while Williams was pursuing and cursing the defendant, and so being assisted by other persons in the yard, the defendant struck with his knife in his own necessary self-defense. That the defendant was all the time, from the beginning to the ending of the difficulty, at the time and place acting in his necessary self-defense, and was all the time trying to prevent a difficulty and to avoid any collision with Williams and all other persons."

The court charged upon murder of the first and second degrees and manslaughter, and submitted this, and only this, charge upon the subject of self-defense: "Homicide is permitted by law when inflicted for the purpose of preventing the offenses of murder, rape, robbery, maiming, disfiguration, castration, arson, burglary and theft at night; but in such case it must reasonably appear by the acts, or words coupled with threats of the person killed, that it was the purpose and intent of such person to commit one of the offenses named."

Considered in the light of the facts in this case, this is a most remarkable charge. What had robbery, maiming, theft at night, or castration to do with this case? The deceased was killed at a social gathering. There was no attempt to rob, rape, maim or castrate any person.

There is another serious objection to this charge. It requires the words to be coupled with threats in order for it to reasonably appear that it was the purpose and intent of the party killed to commit one of the offenses. The purpose may appear with threats if the words are coupled with the acts of the party killed. But suppose that the above charge was perfectly unobjectionable in every particular, it would simply announce an abstract proposition of law. There is no attempt to apply the law to that theory of the case which is presented by the evidence of Bettie Boulding. The rule upon this subject is, that instructions should not be presented in the form of abstract propositions, but should be constructed upon the evidence in the particular case at bar. A state of facts should be supposed which accords with the evidence; then deduce the legal conclusions applicable to such state of facts. (*Burrell* v. *The State,* 18 Texas, 713; *O'Connell* v. *The State,* 18 Texas, 343.) This rule applies not only to the case as made by the evidence, but to every phase which has any support in any part of the evidence.

We are of the opinion that the court should have applied the law directly and affirmatively to the theory of the case made

by the evidence of the witness Bettie Boulding. We also suggest the propriety of instructing the jury upon the subject of cooling time, in view of the evidence of some of the witnesses for the defendant.

The other assignments will not be discussed, as the case will probably be divested of these questions on another trial.

For the errors in the charge the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered February 3, 1883.