No. 2769.

B. F. Blocker *v.* The State.

On Rehearing.

1. Practice—Murder—Charge of the Court.—It is an established rule of practice in this State that, upon the trial of an offense which comprehends different degrees it becomes the imperative duty of the trial court to instruct the jury upon the law applicable to every degree or grade of offense indicated by the evidence, however feeble such evidence may be; that, if there be a doubt as to which of two or more grades of the offense the accused may be guilty, the law as to all of such grades should be charged, and that the trial court should omit to charge the law of any particular grade only when it is to no extent whatever raised by the evidence. See the statement of the case for evidence adduced on the trial for murder, which, though sufficient to establish the express malice essential to constitute murder of the first degree, is not of such character as to absolutely preclude the jury from finding therefrom a killing upon implied malice, and, therefore, murder in the second degree; wherefore the omission of the trial court to instruct the jury upon the law of murder of the second degree was error.

2. Same.—The accused, being on trial for murder, contends that, under the law of this State, it is the duty of the trial judge, in murder cases, without regard to the evidence adduced, to instruct the jury as to the law of murder of the second degree. But *held* that, notwithstanding the apparent plausible construction of the statutes upon which the proposition is maintained, the doctrine obtains in this State that the trial court may decline to submit to the jury the issue of murder of the second degree when the evidence wholly fails to present that issue. See the opinion in extenso upon the question, and note the suggestion relative to the charge in trials for murder.

APPEAL from the District Court of Bowie. Tried below before the Hon. W. P. McLean.

The conviction in this case was in the first degree for the murder of G. W. Wood, in Bowie county, Texas, on the eighth day of March, 1887. The penalty assessed by the verdict was a life term in the penitentiary.

John W. Clowers was the first witness for the State. He testified that he knew the defendant, whom he identified in court, and that he knew Wood in his lifetime. Wood met his death in Bowie county, Texas, in 1887, at about two hours after sun rise on a day the witness did not remember. He was killed by a gun shot at or near a shanty which had been constructed in a lumber camp, and which shanty he was supposed to be pulling down at the time he was killed. At that time the witness was about three-quarters of a mile distant from the said shanty, "getting out" ties for the defendant. The said shanty was in an east direction from where the witness was at work. There was a road about fifty yards distant from where the witness was at work. The defendant, riding a chestnut sorrel horse, and B. F. Pittman, riding a bay horse, and each armed with a Winchester rifle, came to where the witness was at work on that morning. When they left, they went through the woods in a northwest direction. They may or may not have gotten into the road before reaching the shanty—if they went to it. About fifteen minutes after they left the witness heard the report of a gun fired from the direction and about the locality of the shanty. Soon after the gun shot mentioned, the witness called the attention of Messrs. L. C. Pope, Peacock, William Knighton and Neeley Poplin to tracks at the place where he, witness, was at work, which tracks were made by the horses of the defendant and Pittman a quarter of an hour before the shot was fired. The tracks of those horses were trailed by the witness and other parties from the place where the witness was at work to the place where the killing occurred. When the witness went to the place of the killing, after hearing the shot as stated, he found the dead body of Wood, lying at the corner of the shanty.

Cross examined, the witness said that the carrying of guns in the neighborhood was not unusual. The house in which the witness lived was about two hundred and fifty yards a little

north of east from the place where he was at work when he heard the gun shot, and it was between a half and three-quarters of a mile distant from the place where Wood was killed. Witness was west from his house and west from the shanty where Wood was killed. To go direct from where the witness saw them, to Wood's shanty, the defendant and Pittman would necessarily pass the witness's house. For a week prior to the killing Wood had been idle. Prior to that time he worked a week or two for the defendant. Witness did not know who Wood was working for when killed. The witness saw no horse tracks at the place where he was at work when defendant and Pittman joined him, either before or after that time, except those made by the horses ridden by the defendant and Pittman.

L. C. Pope was the next witness for the State. He testified, in substance, that Wood met his death on the morning of Tuesday, March 8, 1887, in Bowie county, Texas. The witness saw his dead body on that morning, about an hour and a quarter after the shooting. It lay against the northwest corner of a pole shanty that had been built for the occupation of tie cutters, partly on the side and back, with the left leg considerably and the right leg partially drawn up. The arms were also drawn. Witness found three wounds on the body, one entering the back to the left of the spinal column, one in the leg, about three inches above the knee, and the third cutting across the right thumb. The said wounds appeared to have been made by medium sized balls. The empty shell of a rifle cartridge, No. 38 in size, was found on the ground near the body. The defendant owned a gun at the time of the killing, but witness did not know what kind of a gun it was. The witness, who, with Mr. Knighton, Mr. Poplin and Mr. Pretty, examined the ground, found, near the body, the tracks of two horses, one shod and one unshod. The said tracks approached within twenty steps of the point where the body lay, whence they went west a short distance, and thence south. The tracks were very plain at the point, about a hundred steps distant from the body, where they crossed a branch. The witness and his companions back trailed the said tracks from the point near the body, to the point in the woods where Mr. Clowers was said to have been at work when the fatal shot or shots were fired. The tracks near the body, and along the trails, and at the point where Clowers was at work, corresponded in size, by measurement, and in appearance. At each of the said places they

showed to have been made by a shod and an unshod horse.   The
condition of the pole shanty when the witness reached it, an hour
and a quarter after the killing, indicated that, when killed,
Wood was removing, or preparing to remove the timbers of the
shanty.   One side of the shanty had been completely razed,
and between fifteen and twenty boards had been torn from the
other side.   The boards taken from the shanty were lying by
the side of the same, and a wagon to which an ox team was
hitched, and which was understood to belong to Wood, was
standing near.   There was nothing in the hands of deceased
when witness reached the body.

Cross examined, the witness said that he was present at the
inquest upon Wood's body, and saw a member of the jury take
a forty-four calibre repeating pistol from the hip pocket of the
deceased.   The witness did not see either a broad ax or pole ax
near the body, but saw a double bladed ax near it.   Eight or
ten people, all of them having come on foot, were at the body
when the witness reached it.   He saw no horses there at that
time.   The witness was at the body a minute before he saw any
of the horse tracks near the body, and fully thirty minutes
elapsed before he went to the point in the woods where Clowers
claimed to have been at work at the time of the shooting.   The
witness had been at the body about fifteen minutes before he
observed Mr. Clowers.   The tracks back trailed by witness from
the point near the body to where Clowers claimed to have been
at work, traversed what the witness considered to be a very dim
road.   The witness could not say that he saw and examined
each consecutive track over that trail, between the two points
mentioned, but he followed the trail, just as he would follow
the trail of a horse he had lost, and that trail led him from the
point near the dead body to the point where Clowers had been
at work.   The witness had never testified on a former trial of
this case that he saw four wounds in the body of deceased; or
if he did, he did so by inadvertence.   The witness did not hear
the fatal shots, but was told by Mr. Knighton that he, Knigh-
ton, heard shooting on that morning.   Soon afterwards Mr.
Pretty told witness of the killing of Wood.   Some of the cham-
bers of the pistol found on the body of the deceased were
loaded, and some were empty.   Witness did not remember how
many were loaded nor how many were empty.   Mr. Pretty's
house, which was the nearest one, was between three and four
hundred yards from the place of the homicide.   The witness

measured the several horse tracks mentioned by him with a stick, and found them to correspond in size, as they did in appearance.

T. H. Lenox was the next witness for the State. He testified,. on direct examination, as follows: "I knew the defendant, and I knew G. W. Wood in his life time. I saw Wood after his death at a tie camp about nine miles from DeKalb, in Bowie county. He was in a wagon when I first saw him; he was lying in the wagon preparatory to be taken to Mr. Pope's to be buried. They showed me two wounds on him; one was in his thigh. I did not notice particularly, and do not know in which leg. The other was in this (places his hand on his back) portion of his back. The wounds I saw went in from behind, and were made with bullets. I noticed his shirt too where it was. shot. The shots were not fired from the largest size Winchester rifle or pistol. I arrested Mr. Blocker and Mr. Pittman. Mr. Blocker was at home—that is he was in his field. It was just after dark when we reached his house, and we hallooed for him two or three times. Mr. Pittman was at Mr. Blocker's; we had him there, and he hallooed for Mr. Blocker. Mr. Blocker was down west of the house; he came from towards. the barn; was walking and leading a small sorrel bob tailed horse; he had a Winchester rifle, I think it was a thirty-eight. I had it in my hand. We carried Mr. Blocker into DeKalb and put him under guard that night at the Bullard hotel. When we arrested him he had a small sorrel, blazed face, bob tailed horse. That night in traveling the horse seemed to be crippled .very badly. I asked the cause and he said that 'he interfered.' The next morning a party of us examined the horse's feet, and his front feet were trimmed closer than I ever saw a horse's feet worn or trimmed. I do not think there were any nail holes in his feet. I noticed that they were trimmed or filed off very close. I made a rapid examination of the ground about the place of the homicide. I was shown the point, about twelve steps distant from the shanty, where two horses had stood, from which point I followed them to where they crossed a branch sixty or seventy yards distant. One of those horses was shod in front; the other was barefooted. The bank of the branch where they mounted it was very nearly perpendicular and was about three feet high. From the shanty, as far as I trailed them—to the crossing of the branch—the tracks showed that the horses traveled on a full run. I saw no weapons on

or about the person of the deceased.  I observed the condition of the shanty while there.  The boards on the east side of the roof had been recently torn off.  They were torn off, I thought, from their appearance, on that day.  Certainly not more than two days had elapsed since they were torn off."

On his cross examination, the witness said that his feelings for the defendant were neither kind nor unkind.  He did not feel unkindly to him, but did not love him, and entertained a much more favorable opinion of many other men than he did of the defendant.  Witness and defendant, about four years before this trial, had a disagreement about a filly.  They had no law suit about it.  Witness and defendant each claimed to own the said filly, and the witness got it.  It was about an hour and a half after dark on the fatal day when the witness, with Officer Rose, Mr. Chapman and another person, reached the defendant's house and arrested him.  They arrested Pittman at defendant's house before they made the arrest of defendant.  The witness and his party reached DeKalb with their prisoner between eleven and twelve o'clock on that night.  Witness did not know what was done with defendant's horse between the hour of their arrival in DeKalb and nine o'clock on the next morning, when witness next saw that animal.  The witness had no recollection of seeing defendant on the eighth day of March, until he arrested him.  He was told that the defendant was in DeKalb on that day.

Re-examined, the witness described the Winchester rifle which the defendant had, when arrested, as a gun which chambered fourteen cartridges.  A single movement of a lever would throw off an exploded shell and place a cartridge in position for shooting.  Some time after the disagreement between witness and defendant about the filly referred to in the direct examination, the defendant reported to witness that he had become satisfied that the animal in dispute belonged to witness, and that he had found his animal.

W. B. Knighton, the next witness for the State, testified as follows: "I knew G. W. Wood in his lifetime.  When I first saw him dead he was up by the corner of a little shanty in an old tie camp, about nine miles from DeKalb, Bowie county.  He had been shot three times—once in the back, once in the leg and once in the hand.  I guess he had been dead when I got to him about an hour and a half; it was about that long since I heard the guns.  I heard three shots.  I made an investigation

as to tracks around the place, after I got there, and found the tracks of two horses coming from the way Mr. Wood lived—one was shod in front and one was barefoot. Wood lived three-fourths, probably a mile, from the tie camp. The tracks stopped about nineteen or twenty steps from the dead body; from where they stopped they ran south across a branch. We tracked them into the woods a short distance the way they went. When we came back Mr. Clowers was there, and we took the back track and tracked them to where Mr. Clowers said he had been at work making ties, and where we found some ties and tools. We measured the tracks where the dead man was, and where Mr. Clowers said he had been at work. We measured them at both places, and they measured to be the same tracks. At the camp where the man was killed, and where Mr. Clowers said he was at work, the tracks measured the same, and at both places they looked alike. One of the horses was shod in front and the other was barefooted. In back tracking them to where Mr. Clowers said he was at work, we took a trail that led out and from the road and went by Mr. Pretty's. The tracks seemed to be the same all along. I saw a double billed ax about eight feet from the shanty, but remember nothing else. The bullets entered Wood's body from behind."

Cross examined, the witness said that he lived about one mile distant and a little east of south from Clowers's house, and about four hundred yards a little west of north from Pope's house. The place of the homicide was about a mile southeast from witness's house. The witness reached the place of the homicide about nine o'clock, as near as he could estimate the time. He went to that place with Mr. Pope and his step son, and Mr. Pretty and his son, and found there Sam Phillips, Mr. Poplin and another person whom he did not now remember. The person last referred to may or may not have been Mr. Clowers. He saw Clowers perhaps thirty minutes later—when he got back from trailing the horses. Witness, Pope and Phillips carried guns in trailing the horses. Witness's gun was a seven shooting Spencer rifle; Pope's was an ordinary shot gun, and Phillips's an old fashioned gun of unknown description. Witness saw several Winchester rifles in the possession of parties who had reached the ground by noon. Witness saw several horses on the ground during the day. It was about eight o'clock when he heard the report of the guns. Mr. Clowers conducted the witness and party to the place where he said he

was at work when he was arrested by defendant and Pittman, and he pointed out certain horse tracks at that point. The place where he said he was at work at that time was between twenty-five and thirty steps from the dim road. The first two shots heard by witness on the fatal morning were fired very nearly together; the third after a short intermission.

J. W. Peacock was the next witness for the State. He testified that he had seen Wood a few times in his life time. He last saw him alive a few minutes before his death, on the morning of March 8, 1887. Passing Wood's shanty, at a distance of about two hundred yards, with a load of ties, the witness saw Wood on top of the shanty, removing boards, etc. While driving along the road a very short time later, the witness heard three reports of a gun, the first two fired very near together, and the third after a slight intermission. Witness, who was then not more than two hundred yards distant, hallooed, and presently saw two men running their horses from the direction of the shanty at or near which the guns were fired. As nearly as witness could tell the color of the horses ridden by the men, one was a bay and the other was a sorrel. When witness first saw them, they were between the shanty and the branch, running from the shanty towards the branch. The witness supposed that the two men had fired at a deer or a turkey. He saw no other person at or near the shanty. It was an hour and a half, or perhaps two hours later, before the witness went to the shanty and there saw the dead body of Wood, which, however, he did not examine until the coroner's jury arrived. The witness examined the ground over which he saw the two men fleeing just after the shooting, and saw the track of a horse shod in front and the track of an unshod horse. John Clowers was at the shanty with the body when witness arrived. Witness and others then went to a point in the woods near Clowers's house, where Clowers showed them certain horse tracks. Those tracks were back trailed, step by step, from a point about twenty steps from the body to the point where Clowers exhibited the tracks,—that being the point where Clowers claimed to have been at work at the time the shots were fired. The tracks at that point, and over the trail, and at or near the shanty, and which led away from the shanty, to and across the branch, over the route pursued by the men seen by the witness just after the shooting, corresponded perfectly in size and appearance. Witness could tell by the falling of boards and

poles that Wood was tearing off boards and throwing them down when he was shot. The reports of the gun and the noise of the boards intermingled.

Cross examined, the witness said that he lived on the Mill Creek road, a mile or two miles distant from the place of the homicide. He was hauling his first load of ties at the time he heard the shots and saw the two men fleeing from the vicinity of the shanty. There were several tie camps or shanties in the neighborhood of the Wood shanty. There was one about four or five hundred yards up the branch, and another four or five hundred yards west from the place of the homicide. The place where Clowers said he was at work when the shots were fired was five, six or seven hundred yards distant from the place of the homicide — witness could not state the exact distance. Clowers's house was about six hundred yards distant from the Wood shanty, as witness would estimate the distance—somewhat nearer to the said place than was the place where Clowers said he was at work on that morning. Witness did not recognize either of the men he saw on the horses, fleeing from the place of the homicide. He knew defendant quite well, and had often seen Pittman, but did not recognize either of them as the men whom he saw on that morning. The growth between the point where the witness was and the ground over which the two men fled was sparse. Witness did not observe those parties for the purpose of identifying them. He merely thought they had shot and were pursuing game of some kind. They rode hurriedly, and, where the ground admitted of it, at top speed.

L. C. Pope, recalled by the State, testified that for some time prior to the killing he had charge and control of the Bob Lassiter land, as Lassiter's agent. Some time prior to the killing of Wood, witness contracted to sell him, Wood, the timber on two hundred acres of the Lassiter land. Defendant had no interest in any ties on the Bob Lassiter land, so far as witness knew. He never claimed any interest whatever in or to anything on the Lassiter land—at least, he never made such a claim to witness. For a while previous to the homicide, the deceased worked for the defendant, getting out ties.

Bob Lassiter testified, for the State, that he knew both the defendant and the State's witness, L. C. Pope. Mr. Pope represented the witness as agent for land he owned in Bowie county, in 1887. The witness, in 1887, sold the cross tie timber

on the Bukahn survey in Bowie county to defendant and Pittman, as partners. This transaction was had with Pittman, who represented himself as agent and partner of defendant. The bill of sale was made to Blocker & Pittman. The witness afterwards wrote to Pittman that his agent, Pope, had sold the timber on some of the land to Wood.

J. B. Chapman testified, for the State, that he was a blacksmith by trade, and that he lived in DeKalb, Bowie county, Texas. Witness shod the front feet of a small white-legged sorrel horse for defendant, a few days—not more than a week, and perhaps not so long—before the killing of Wood. He next saw the horse on the night of the fatal day. Witness, Captain Lenox, Rose, Dock Mills and somebody else went to defendant's house and arrested him that night, and took him to DeKalb. The party reached defendant's house after dark. Defendant came to them from the direction of his lot, bringing with him the same sorrel horse which witness had shod a few days before. The witness saw that horse about twelve o'clock on that night, and again on the next morning. He examined the horse on the next morning, and found that the shoes he had put on the front feet had been recently pulled off, and that the hoof had been trimmed to the quick—almost spoiling the feet. The nail holes had been trimmed out. Defendant was in DeKalb between eleven and twelve o'clock on the fatal day. He tied his horse to a tree, and put his gun in witness's shop. When the witness got back from dinner the gun was gone. The horse's feet at that time were not in the condition in which the witness found them next morning. Pittman rode a bay horse into town after his arrest on the night of the fatal day.

Cross examined, the witness stated that he did not recollect whether or not he examined the feet of the defendant's horse on the night of the fatal day or until the next morning. If he did, it was after reaching DeKalb, and he did no more than lift up one of the feet. He carefully examined the feet on the next morning, and called the attention of at least a dozen people to their then condition. The defendant's horse was hitched behind a saloon in DeKalb when witness saw it on the night of the fatal day, and was at the same place when witness saw it next morning. Defendant was then under guard in the Bullard Hotel. Witness and the defendant's brother once had an insignificant quarrel.

W. B. Presley testified, for the State, that he went to DeKalb

on the day of the homicide. He was overtaken on the road near DeKalb by the defendant, who was riding a small streak-faced sorrel stallion. They rode into DeKalb together about eleven o'clock and hitched their horses near Chapman's blacksmith shop. Defendant's horse had shoes on the front feet. He appeared to have been but recently shod. The defendant when he overtook witness had a Winchester gun on his saddle, and his horse was sweating from the girth forward.

Miss Alice Pretty testified, for the State, that she lived at her father's house, about three hundred yards distant from the shanty at which Wood was killed. She did not know either the defendant or Pittman. Early on the morning of March 8, 1887, Wood, riding in and driving an ox wagon, passed the witness's house, going towards the shanty. She afterwards heard a noise which proceeded from the neighborhood of the said shanty, and which sounded like some person was violently tearing boards from the same and throwing them to the ground. Some time later, witness could not say how long, but when the sun was about two hours high, two men riding horseback—one on a small sorrel and the other on a bay horse—passed the witness's house, going in the direction of the shanty. They were both armed with guns. Witness did not then know either of the men, but she thought that she afterwards, in the court house in Texarkana, saw the man who was on the bay horse, and, if so, that man was Pittman. Within two minutes after those men passed beyond the sight of the witness, she heard three reports of a gun or guns. The first two shots were fired very nearly at the same time, and the third after a short intermission. The noise which sounded to witness like falling boards blended with that of the shooting. Witness soon afterwards went to the shanty and saw Wood's dead body.

Cross examined, the witness said she did not know that she saw the defendant on the fatal morning, unless he was one of the men who passed her house on horseback, just before the guns were discharged. Those two men were then strangers to her. She was not positive, but was confident, that the man she pointed out at the habeas corpus trial, and who she thought was Pittman, was one of the men who rode past her house on that morning. Cass Pope did not, at the request of witness, point Pittman out to her at the habeas corpus trial.

George Reed testified, for the State, that, after breakfast on

the morning of March 9, 1887, he saw the horse that was said to have been ridden into DeKalb on the night before by the defendant, and, at the instance of defendant, who was then in jail, took that and another horse to a stable and fed them. The front feet of the defendant's horse were in a wretched condition, the result of recent trimming. The hoofs were trimmed close enough to obliterate all of the nail holes, except perhaps one or two.

N. M. Carpenter testified, for the State, that he lived in a house on defendant's place at the time of the homicide, and was then in the employ of the defendant. About sun rise, or a very little time after, on the fatal morning, the witness went to defendant's barn. As he stepped into the barn he observed Pittman squatted near one of the horse stalls. Within a very short time the defendant came into the barn with his Winchester gun in his hand, which he put down, resting it against the stall which contained his star faced sorrel horse. The witness then left the barn and saw Mr. Pittman's bay horse, under saddle, standing by a wagon in the field. The witness now lived on the place of Mr. Lenox, at the mouth of Mill creek.

The State closed.

Eddie Van Bibber was the first witness for the defense. He testified that he was twelve years old. He remembered the killing of Wood. When the fatal shots were fired the witness was standing on the big road, about one hundred and twenty or one hundred and fifty yards distant from Wood's shanty, talking to Mr. Peacock, and to Charley Phillips, a boy about twelve years old. Immediately after the shots were fired the witness ran to the shanty, and saw Wood lying on the ground, groaning. Two men, one armed with a shot gun and the other unarmed, so far as the witness saw, were walking rapidly away from the direction of the wounded man, towards Blocker's house. One of those men the witness took to be Mr. Baker, the partner of Wood, and the other he took to be Mack Lynch. Witness saw no horses about the shanty. As soon as he realized what had happened, the witness ran off to the house of his cousin, John Clowers, and reported the shooting of Wood.

On cross examination the witness said that Mr. Peacock was on the ground in the road, and not in his wagon at the time of the shooting. Charley Phillips was in the wagon, holding the lines. Peacock hallooed when the guns fired. The witness, who was on his way to his cousin, John Clowers's, house,

thought that some person was shooting at a deer, and he ran in the direction of the shots, which was towards the shanty. The witness was not absolutely positive that the men he saw going from the shanty were Baker and Lynch. He, however, was very confident of that fact, especially as to Baker, as the clothes worn by that man were similar in every respect to those habitually worn by Baker. The man who had the shot gun was the man the witness took to be Lynch. The said two parties were not more than ten steps distant from the shanty when witness saw them.

S. A. Barton testified, for the defense, that he last saw one George Baker on the Sunday preceding the Tuesday of Wood's death. Witness and Buck Blocker, a brother of the defendant, met Baker on the road in the vicinity of the defendant's plantation, on the morning of the said Sunday. On that occasion Baker attempted to buy a gun from Buck Blocker, which Buck declined to sell. Buck soon left the witness and Baker together, when Baker remarked to witness that Wood had threatened him several times; that he, Baker, had no ties to keep him in Bowie county, and that he would be even with Wood when he, Baker, and witness should next meet; that Wood recently found him asleep in the shanty, and told him that the next time he, Wood, caught him, Baker, asleep, he would kill him; and he, Baker, told witness that Wood had crowed over him long enough, and he thought it best to get even with him. Witness had never seen Baker since. Baker and Wood were partners in getting out and selling tie timber. On his cross examination the witness declared that he did not know as a fact that Baker left the vicinity and went to Texarkana, before the killing occurred. He had been told, however, that Baker went to Texarkana on Monday, the day before the killing.

M. R. Barton testified, for the defense, that he met George Baker in DeKalb on Monday, the day before Wood was killed. When witness got ready to leave that town to go home he remarked to Baker: "I believe I will strike for the western breezes"—meaning that he would go home. Baker replied that he was going to strike for the northern breezes. The witness then asked him if he was going to leave, and he replied that he was, and in an angry manner said that he and his partner Wood had had a row on that morning. Witness understood Baker to mean that he was going north,—a direction that would

not take him towards the place of the homicide. Witness had not seen Baker since. On his cross examination the witness stated that he did not know that Baker left the country prior to the killing of Wood. As stated, he last saw Baker in De Kalb on the day before the killing. Witness felt no especial interest in the result of this trial.

R. J. Ellis testified, for the defense, that he lived on the place of M. P. Blocker at the time Wood was killed. He last saw Wood alive on the day before he was killed. Wood was then at the defendant's place. He got some lumber from the defendant, which the witness helped him to load on his wagon. During the time Wood was at defendant's place on that day he and defendant spent some time in conversation. Witness did not hear what they said to each other, but they talked in a perfectly natural and friendly manner. Baker and Wood were both at the defendant's house on the previous Friday evening. They all appeared to be on friendly terms, and defendant pressed Wood and Baker to remain at the house for supper.

W. W. Pope testified, for the defense, that about ten days or two weeks after the killing of Wood he saw the Blocker sorrel stallion in DeKalb, and, having heard reports concerning the condition of its front feet, he took occasion to examine them. The condition of the front feet indicated to witness that shoes had been taken therefrom about ten days before. Witness found nail holes—he could not say how many—in each of the front hoofs. Nothing about the said hoofs indicated to witness's mind that they had been recently trimmed to the quick, and witness did not think that if the said hoofs, ten days before that time, were in the condition they were generally reported to be in, they would be in the condition in which he found them. Witness could discover nothing more than that a pair of shoes were torn from the feet about ten days before.

S. P. Phillips testified, for the defense, that about seven days after the killing of Wood, he traded for the defendant's certain dark sorrel pony stallion. If anything was the matter with the front hoofs of that horse when witness got him, witness did not then, nor has he since detected it. The front feet were unshod, but there were nail holes in each of the front hoofs, at least one inch from the edges of the same. Witness had to trim those hoofs twice before he got the nail holes out.

Reed Phillips testified, for the defense, that he saw the defendant's sorrel stallion pony, on the day of the homicide, but

did not then observe his front feet. He next saw that animal on the second day after the killing, when, having heard talk about the condition of the front feet, he examined them. He found that a pair of shoes had been recently removed from the front feet, but the hoofs were in good condition—not hurt at all. Witness observed between eight and twelve nail holes in the two hoofs.

J. H. Roden testified, for the defense, that he was at the house of the defendant on the morning of the homicide. Between seven and eight o'clock—when the sun was about an hour high—the defendant left his lot, alone, and went west across his field towards the house of his father, about a mile distant. He did not start towards Carpenter's house, but could have left the direction in which he was going, and gone to Carpenter's. He had his Winchester gun with him. He always carried his gun when he left home.

George Hamlin testified, for the defense, that he was at the house of the defendant's father on the fatal morning. Defendant reached his father's said house when the sun was about three quarters of an hour high. It was about that time when the witness saw him in the lot, northwest of his father's house. Defendant remained at his father's house about half an hour and left, going south towards the railroad. Old man Blocker's said house was about two miles distant from the place of the killing. Besides the witness, Alfred Barton and Buck Blocker were at old man Blocker's when defendant reached there on the fatal morning.

Alfred Barton, recalled by the defense, corroborated the testimony of Hamlin, and added that after talking with defendant at old man Blocker's house for perhaps thirty minutes, he went with defendant and Buck Blocker to the railroad to count some ties. They remained there about three hours. When the defendant left, going towards, and saying that he was going to DeKalb. The place where they counted the ties was two or two and a half miles distant from the place where Wood was killed. Witness was not questioned about this matter when previously on the stand. Buck Blocker testified, in effect, about as did the witnesses Hamlin and Barton. He fixed the time when defendant reached his father's house on the fatal morning at an hour or an hour and a half after sun rise, and the hour at which he left the point on the railroad where the ties were counted at half past nine o'clock or ten o'clock.

M. P. (old man) Blocker, testifying for the defense, located the hour of the defendant's arrival at his house on the fatal morning, at about seven o'clock. He left about thirty minutes later with Buck Blocker and Alfred Barton.

The defense closed.

G. D. Sims testified, for the State, that, about noon of the day after the killing of Wood, he saw George Baker in Texarkana, going towards the Arkansas line. He had not seen Baker since.

*Crawford & Crawford,* and *R. D. Harrell,* for the appellant, and in support of the motion for rehearing: 1. The evidence demanded a charge upon murder in the second degree. * * * 5. The court should charge both degrees of murder in all cases, and leave it to the jury to determine for themselves the degree. Article 605 of the Penal Code provides that, "Every person with a sound memory and discretion who shall unlawfully kill any reasonable creature in being within this State with malice aforethought, either express or implied, shall be deemed guilty of murder. Murder is distinguishable from every other species of homicide by the absence of circumstances which reduce the offense to negligent homicide or manslaughter, or which excuse or justify the homicide."

Article 606, Penal Code: "All murder committed by poison, starving, torture or with express malice, or committed in the perpetration or in the attempt at the perpetration of arson, rape, robbery or burglary, is murder in the first degree, and all murder not of the first degree is murder of the second degree."

The distinction in the degrees of murder is predicated solely upon the difference between express and implied malice. Implied malice is constructive malice, and is not a fact to be proved specifically. In order to convict of murder in the second degree the prosecution is only required to show the unlawful killing, and from this fact alone malice is implied. The unlawful killing having been established, the defendant, if he would reduce the offense to manslaughter, must show such facts and circumstances independent of the homicide as would make the offense manslaughter under the law.

On the other hand if, after showing the unlawful killing, the prosecution seeks a conviction for the first degree, it must prove as a fact, independent of the killing, that it was done with express malice. "While the law implies malice on proof of

voluntary homicide, it does not impute express malice. This is an inference not of law, but a question of fact consisting of intention dependent upon the state of the mind. And to warrant a conviction of murder in the first degree, it must be proven like any other fact in the case by such evidence as is reasonably sufficient to satisfy the jury (not the court) of its existence." (Farrar v. The State, 42 Texas, 272.)

The State might prove a clear and conclusive case of murder in the second degree, and the evidence need not show the existence of a single isolated fact tending to reduce the offense to manslaughter. In such a case the court need not and should not charge upon manslaughter, there being an entire absence of evidence to support such a theory or defense.

But the evidence necessary to establish murder in the first degree always shows every essential to murder in the second degree. To establish the second degree, proof of the unlawful killing alone is necessary. To establish murder in the first degree, you must go one step further—prove one additional fact— that is that it was with express malice. It is simply impossible to prove or make out a case of murder in the first degree without proving every essential element in murder in the second degree. In the language of Judge Hurt, in McLaughlin v. The State, 10 Texas Court Appeals, 361: "It is logically impossible to prove express malice without proving malice, and if the killing be upon malice the offense is murder." But not murder in the first degree. Here is not an absence of evidence necessary to establish a given fact, but a redundancy of proof. In no case can evidence of express malice—we care not how conclusive or convincing the proof may be—disprove implied malice. In every murder trial, where the testimony is of such a character that a charge upon murder in the first degree is demanded, two theories, that of murder in the first and murder in the second degree, are necessarily presented. To establish the first, the State must prove the killing, and as an additional fact must show that it was upon express malice. To establish the second, the State must prove the unlawful killing, and, nothing to extenuate or justify the act appearing, the legal presumption arising from the act of killing alone makes it murder in the second degree.

Every man is presumed to be innocent until his guilt is established by competent evidence. This presumption of innocence attaches as well to the degrees of murder as to the act of kill-

ing. The plea of not guilty puts in issue not only the act of kill-ing but the degree of the offense. The doctrine of reasonable doubt applies to both, and it is for the jury, and the jury alone, to determine upon a fair and affirmative presentation of the issues whether or not the testimony relied upon to establish express malice overcomes and overwhelms the legal inference arising from the act of killing, and the presumption of innocence as well. In no case has the court the right, either directly or in-directly, to assume that it does. And a failure to charge upon murder in the second degree virtually assumes that the evi-dence of express malice overwhelms and destroys the proof of implied malice. This is an invasion of the province of the jury. Express malice is a fact—it must be established by the testimony. True, the jury may, from other facts, infer it as a fact, but the court is not authorized to tell the jury, directly or indirectly, that from certain established facts they must infer express malice, or acquit. Negligence is a fact, and its exist-ence or non-existence must be found by the jury from the other facts proven in the case. The law has not undertaken to say what acts are sufficient to constitute negligence, and it matters not what the act is, the court is not warranted in charging the jury that it constitutes negligence. (Railroad v. Murphy, 46 Texas, 366–368.)

The Code has not defined express malice, and the court can not assume that it is proven in any case, no matter what the testimony may be. And where the killing is not controverted, we insist that for the court to charge only on murder in the first degree is virtually to tell the jury that the facts in the case show express malice, and, notwithstanding a correct definition of express malice may be given, the practical effect of such a charge is to direct the minds of the jury to the slayer alone, and not to the motive which prompted the deed.

In Johnson v. The State, 27 Texas, 766, Judge Moore said: "It is only necessary to give such instructions as are applicable to every legitimate deduction which the jury may draw from the facts." This has been often followed, and we freely admit that such is the law.

In Johnson's case the court charged on both degrees of mur-der, but refused to charge the law of manslaughter. The facts relied upon to reduce the offense to manslaughter were threats made by the deceased. There was absolutely no proof that at

3

the time of the killing deceased was attempting to execute the threats. And to this case and all others where there is absolutely no proof of a fact or theory the rule is applicable, but it has no application to cases in which there is a redundancy of proof necessary to establish a fact or theory.

Foster v. The People, 50 New York, 598, is sometimes referred to as supporting the doctrine that the court need not charge upon a degree of crime not shown by the evidence. Properly understood, the case is an authority in support of the proposition which we assume, and is in harmony with the rule declared in Johnson's case. It was a prosecution for murder (the famous car hook case). The New York Statute divides homicide into murder in the first and second degrees. The New York Statute declares that such killing, unless it be murder in the first degree or manslaughter or excusable or justifiable homicide, or when perpetrated without any design to effect death by a person engaged in the commission of any felony, shall be murder in the second degree. Under this statute those cases only were murder in the second degree in which the killing was by a person engaged at the time in the commission of a felony. Thus, under that statute, in order to reduce a killing to murder in the second degree, you must show as a fact, independent of the homicide, that it was committed by some one engaged at the time in the commission of a felony. There being no evidence tending to show this fact the court correctly refused a charge upon that degree.

Here is a total absence of any proof tending to show that the homicide was committed in the attempt to commit a felony. The court charged "that the defendant could not be convicted of murder in the first degree unless he acted from a premeditated design to effect the death of the deceased, and that in the absence of such an intent his offense was reduced to manslaughter." This charge was correct for the reason that proof of murder in the first degree includes and necessarily establishes every essential element in manslaughter under the New York Code, together with the further and additional fact that defendant acted from a premeditated design to kill. Here the facts present not an absence of proof of manslaughter, but a redundancy of evidence. Just as it is in this State, proof of murder in the first degree necessarily establishes murder in the second degree, and an additional fact, to wit, express malice.

The facts in Foster's case are short. They show a most

brutal killing. The victim was an unoffending passenger in a street car, and was most cruelly murdered without cause, the instrument being used was an iron car hook. But still the court did not feel at liberty to take from the jury the question as to whether or not it was used with a premeditated design to kill. And we most earnestly insist that in our State it is wrong for the court to take from the jury the right to determine for themselves whether or not the evidence shows a cool, sedate and deliberate mind and formed design to kill or, in other words, express malice. (See Foster v. The People, 50 N. Y., 599.)

A refusal to charge, or a negative charge, necessarily impresses the jury with the idea that in the opinion of the judge presiding, the evidence establishes the higher degree. (10 Texas Ct. App., 357.)

Article 607 of the Penal Code is as follows: "If the jury shall find any person guilty of murder they shall also find by their verdict whether it is of the first or second degree, and if any person shall plead guilty to an indictment for murder a jury shall be summoned to find of what degree of murder he is guilty, and in either case they shall also find the punishment."

This is a special provision applicable to this particular offense and must control every general provision. (See art. 5, Penal Code.)

We submit that the plain meaning of article 607 is that in all prosecutions for murder the jury are to determine the degree from a consideration of all the evidence uninfluenced by any opinion of the court, no matter how this opinion may be expressed, and in no case has the court the right to give the jury a peremptory instruction to find a particular degree or acquit. And further, the jury have undoubtedly the power to fix a lower degree to the crime than the statute provides.

*W. L. Davidson*, Assistant Attorney General, for the State: The position assumed by the appellant, in his motion for rehearing, that in all trials for murder it devolves upon the trial court to instruct the jury upon the law applicable to both degrees of murder, can not be maintained. On the contrary, the established rule is that the trial court shall only give in charge to the jury "the law applicable to the case" as made by the evidence. (Code Crim. Proc., art. 677.)

By the words "the law applicable to the case," is meant the "case" made by the allegations and the evidence adduced on

the trial. (Kouns v. The State, 3 Texas Ct. App., 13; Stewart
v. The State, 15 Texas Ct. App., 598; Cooper v. The State, 22
Texas Ct. App., 419; Parker v. The State, 22 Texas Ct. App.,
105; Willson's Crim. Proc., secs. 2335, 2336, 2337, and authorities
there cited.)

In Texas a party can only be convicted of the offense charged
and proven. If it were otherwise, and defendant be correct in
his assumptions as to murder indictments, the jury could con-
vict of either degree of murder without reference to the facts,
and the courts would be helpless to remedy the evil because
the jury had found the degree, although the testimony might
or would indicate a different or inferior degree. Under his
theory, a defendant being charged with murder, and the testi-
mony proving that murder of the first degree has not been
committed, the court would still be forced to charge upon it,.
as well as on the second degree, and if the jury convicted of
the first degree, their verdict must stand in opposition to the
facts, because the jury had found that degree and the statute
was imperative in that matter. In that event, the court would
be helpless to relieve the party of an unjust punishment.

As insisted upon by defendant, article 607 of the Code, re-
quiring the jury to specify the degree of murder as found by
them in their verdict, would absolutely control the charge of
the court upon the facts as adduced, and also control his action
in passing upon the motion for a new trial.

The fundamental proposition of our system of criminal juris-
prudence is that all parties charged with crime are innocent,
and until this is overcome, no conviction can take place. This
is rooted and grounded in the protection of the citizen against
unjust verdicts and unfair trials. It is above and beyond tes-
timony as a fundamental idea, and must be overcome by testi-
mony beyond a reasonable doubt. If the testimony fails, the
acquittal follows as a matter of course. If the proof fails to
show murder in the first degree, a conviction for that degree
will not stand, it is immaterial how often the jury might find
that degree. The verdict can not convict of a degree above
the proof adduced.

Another fundamental proposition with us is that the charge
must conform to, and be limited by, the allegations in the in-
dictment and the evidence thereunder, and the court has no
discretion to avoid this, nor any authority to exceed it. The
law must be given on the case made, and not on account of de-

grees in the offense, nor because the jury shall or shall not specify certain things in a verdict. That verdict must be governed by the facts in the case and the charge of the court, and the law of the case. A defendant's rights and liberty and life do not depend upon speculation. The charge must be based upon the case made. Murder in the first degree is fully and definitely defined, and is susceptible of definite proof; positive or circumstantial. Murder of the second degree takes in and includes all other cases of murder not so defined, and this is all murder committed upon implied malice.

Where murder is proven upon express malice, or the grounds set out in the definition of murder in the first degree, no charge is required upon murder in the second degree, because no facts are proven to require that charge. But should the facts be shown that require a charge upon the inferior degree, then it must be given. Then it is the facts of the case that authorize or demand the charge, and not a requirement at the hands of the jury to find of which degree they convict. It is immaterial which degree of murder is charged upon by the court, so far as the specifying of the degree in the verdict is concerned. If murder of the second degree alone is submitted to the jury, and they convict of that degree, still they must specify that degree, because the statute requires it.

If murder of the first degree only is proven, would it be necessary to charge upon murder in the second degree? Of course not. Why? Because that is not the case, under the allegations and proof. Should the court charge upon the theory of murder of the second degree, and a conviction follow, and there were no facts to authorize the charge, a defendant would not be heard to complain, because it was beneficial to him, and the verdict would be sustained upon that theory.

But suppose the indictment was for murder in the second degree, and the court should charge upon murder of the first and second degrees, and the conviction be for murder of the first degree, would it be for a moment contended that that verdict could be sustained? Certainly not. Why? Because no such offense was charged in the indictment. It would be convicting and punishing a party for an offense not charged, and would be depriving him of his life or liberty without "due process of law." If defendant's theory is correct, the verdict would be correct, because, as he says, the court would have no discretion to confine the charge to the allegations and proof there-

under, but must submit both degrees in order that the jury should have the right to pass on the two degrees. If defendant's position be the law, then the option of the jury to say which degree of murder should be assessed would override the Bill of Rights—the due process of law—the guarantee of the indictment charging the defendant with the offense for which he is to be tried, the right to be tried for the offense charged, and the law which says to him he shall be tried under allegations and the proof made in the case against him. And why and for what purpose? Simply that a jury may have the privilege of saying of which degree the party shall suffer, although not charged or proven.

All this confusion on the part of appellant arises because of his misapprehension of article 607, of the Code. That article only requires the jury to name in their verdict the degree of which they convict, whether of the first or second degree. This they must find under the case as made and given to them, and does not relate back and control the entire case in order that the jury may have the privilege of passing on the two degrees. If so, then the court would forsooth be compelled to submit both degrees, whether the charge was murder of the first or second degree.

Suppose upon the trial a party is convicted of murder in the second degree, and a new trial be awarded, would it be incumbent upon the court to charge upon murder in the first degree upon a subsequent trial? Of course not; and not only so, but it would be fundamental error if he did so, for which the case would be reversed, if a second conviction should be for murder in the first degree, although it gave the jury the right to decide the important question of the degree of murder. Yet it would be a case of murder charged in the indictment.

The court must charge upon the case at bar, as made by the allegations and evidence, and this is the entire matter in a nut shell. If both degrees are submitted, the jury pass thereon and so say in their verdict, and name the degree of which they convict. If the court does not properly submit the issues under the allegations and facts, a reversal follows because of the injury. The jury in this case did specify the degree of which they convicted. An inspection of the facts will show that the court submitted the case made by the allegations and the evidence.

Defendant says that in all cases of murder, murder in both

degrees must be charged: 1, Because murder is of two degrees; 2, because the jury must find the degree of murder; and 3, where a defendant pleads guilty of murder the jury must pass upon the degree of that offense.   In addition to what has been said, I would call attention to article 714 of the Code of Procedure, wherein it is provided, among other things, that murder includes all the lesser degrees of culpable homicide, and also an assault to commit murder.

If defendant's proposition is the law, we would have divers and sundry degrees of "culpable homicide," and every imaginable one of these degrees would have to be submitted, not because the facts warranted or required, but because of the degrees, and in order that the jury might find the degree of the homicide.   It is sound and well settled practice that, where the different degrees are submitted the jury must either acquit specifically of all the higher degrees, and name the degree of which they convict, or they must, without naming the higher, mention the particular degree of which they convict; otherwise it is not known of what offense the party is convicted.   This holds good through all the degrees from murder to assault to murder.   The naming of one offense in the verdict acquits of the higher degrees of that offense.

The broad and unqualified proposition announced by defendant would lead to a charge not only upon the two degrees of murder, but would require a charge upon all "lesser degrees" of homicide, of every phase and character defined in the code, without reference to the facts proven or the case made, simply because under article 714 the same are included as degrees of murder, under an indictment charging that offense.   Defendant attempts to gloss this over and avoid its effect by seeking to confine the question to articles 606 and 607 of the Code, where the two degrees of murder are set out and where the verdict is required to specify the degree.   Seeing his proposition is too broad, he hedges upon these articles and seeks to control the charge of murder by article 607.

If, as contended, the court has no discretion in the case as made, because the offense has degrees and he is arbitrarily bound to charge all degrees of culpable homicide so that the jury may pass on the same, it would follow that all the "lesser degrees of culpable homicide" would not abridge this great necessity, and the court would be compelled to charge upon every such degree included under the said article 714, where

murder is charged, and it would be immaterial what the facts were, and it would be equally immaterial at which end of the line the charge began, and whether the indictment charged murder or assault to commit murder. If assault to murder was charged, then the court must charge upward for that degree, and if murder was alleged then the charge must submit the degrees downward from that standpoint. This would be the legitimate deduction from the appellant's broadly stated proposition.

### ON MOTION FOR A REHEARING.

WILLSON, JUDGE. In this case the appeal is from a conviction of murder in the first degree, the penalty assessed being confinement for life in the penitentiary.

At our last term at Tyler the cause was submitted on oral arguments and briefs for both parties, and we affirmed the conviction without delivering a written opinion. Counsel for defendant filed a motion for a rehearing and submitted the same upon oral argument and brief, and said motion was transferred to this branch of the court for decision.

It is strenuously insisted by counsel for the defendant that the judgment of conviction should be reversed because the trial court omitted to submit to the jury the issue and law of murder in the second degree. In our first consideration of the case our conclusion was that the evidence adduced on the trial did not present the issue of murder in the second degree, and that therefore the trial court did not err in omitting to instruct the jury as to the law of such issue. After a careful re-examination and reconsideration of the voluminous statement of facts, in the light of the able argument and briefs of counsel for the defendant, we entertain very grave doubts of the correctness of our conclusion.

It is a well settled rule that if from the evidence there is a doubt as to which of two or more degrees of the offense charged the defendant may be guilty, the law as to such degrees should be given in charge of the jury. It is only where there is *no* evidence tending to establish a particular grade of the offense that a charge as to such grade may be omitted. And in a murder case if, by any possible legitimate construction of the evidence, the jury might convict of murder in the second degree, the law of that degree must be given in charge to the jury. (Willson's Cr. Stats., secs. 1064, 2337.)

In this case there is no direct evidence of express malice on the part of the defendant towards the deceased. It was not shown that the defendant entertained any grudge or any enmity whatever against the deceased, nor does the evidence disclose any motive actuating the defendant to commit the homicide. The only evidence of express malice consists in the character of the weapons used; the manner of their use; that the defendant was accompanied by another person armed with a gun; that defendant, in company with such other person, followed the deceased to the place of the homicide; and that after the killing the defendant and his companion precipitately fled from the scene. That the evidence sufficiently establishes express malice we do not question or doubt, but we are not prepared to say that there is *no* evidence from which a jury might not legitimately conclude and find that the homicide was upon implied and not upon express malice. No witness saw or heard what transpired between the parties at the very time of the killing. It is not known what words, if any, passed between the parties, or what, if anything, provoked the killing. Deceased was armed with a repeating pistol, some of the chambers of which were found to be empty. Entertaining, as we do, a serious doubt of the correctness of our first view of the evidence, and of our conclusion that it did not demand a charge upon murder in the second degree, we shall grant the motion for a rehearing, set aside the judgment of affirmance, reverse the judgment of conviction and remand the cause for another trial.

Counsel for defendant earnestly and ably contend that in all prosecutions for murder in this State, without regard to what the evidence adduced may be, it is the imperative duty of the trial court to submit to the jury the issue and law of murder in the second degree. We have been profoundly impressed with the strength of the reasoning advanced in support of this position. Article 607 of our Penal Code provides: "If the jury shall find any person guilty of murder, they shall also find by the verdict whether it is of the first or second degree; and if any person shall plead guilty to an indictment for murder, a jury shall be summoned to find of what degree of murder he is guilty; and in either case they shall also find the punishment." This provision is imperative, and a verdict of guilty of murder, without specifying the degree of murder of which the defendant is found guilty, is a nullity. (Willson's Cr. Stats.,

sec. 1051.)   It unquestionably confers upon the jury the power to fix the crime in the second degree when it ought, under the law and the facts, to be fixed in the first.   And a verdict of murder in the second degree will not be set aside upon the ground that the testimony showed the homicide to be one of murder in the first degree.   (Monroe v. The State, 23 Texas, 227; Blake v. The State, 3 Texas Ct. App., 581; Parker v. The State, 22 Texas Ct. App., 105; State v. Lindsey, 19 Nevada, 47; Baker v. The State, 4 Texas Ct. App., 223; Powell v. The State, 5 Texas Ct. App., 234.)   This power of the jury to find the degree is unrestricted, and can not be controlled or abridged by the charge of the court, or by the omission of the court to submit the issue of murder in the second degree.

It has been held, however, in this State that if the court does not instruct upon murder in the second degree, but the jury finds the defendant guilty of that degree, the conviction can not stand.   (Taylor v. The State, 3 Texas Ct. App., 387; Garza v. The State, Id., 286.)   The writer is inclined to the opinion that such a verdict must be received by the court and judgment entered in accordance therewith, and that it would operate as an acquittal of murder in the first degree.   In accord with the writer's view, it has been held in other States, under statutes similar to ours, that the court can not deprive the jury of their power and right to fix the degree by imperatively instructing them that, if they find him guilty, they must find him guilty of murder in the first degree.   (Rhodes v. Com., 48 Penn. State., 398; Lane v. Com., 59 Penn. State, 375; Shaffner v. Com., 72 Penn. State, 61; Robbins v. The State, 8 Ohio State, 193; Beaudien v. The State, 8 Ohio State, 638; The State v. Lindsey, 19 Nevada, 47; The People v. Ah Lee, 60 Cal., 85; The State v. Dowel, 19 Conn., 387; Baker v. The People, 40 Michigan, 411; The People v. Williams, 73 Cal., 533; see also Whart. on Homicide, secs. 186, 198.)   Such an imperative instruction is regarded as an unwarranted assumption of the province of the jury, and will vitiate a conviction of murder in the first degree.

We have found no authority, however, which directly holds that an omission to submit to the jury the issue and law of murder in the second degree, where the evidence conclusively shows murder in the first degree, presenting no facts from which a jury might legitimately find murder in the second degree, will vitiate a conviction for murder in the first degree.

In this State the decisions are numerous and uniform the other way, holding that where there is *no* evidence from which, by any possible legitimate construction, the jury could conclude that the homicide was murder in the second degree, the court may properly decline to submit to the jury the issue and law of murder in the second degree. It was so held by our Supreme Court in the early case of O'Connell v. The State, 18 Texas, 343. The rule laid down in that case has been followed by a long line of decisions. (Washington v. The State, 1 Texas Ct. App., 647; Taylor v. The State, 3 Texas, Ct. App., 387; Hubby v. The State, 8 Texas Ct. App., 597; Lum v. The State, 11 Texas Ct. App., 483; Neyland v. The State, 13 Texas Ct. App., 536; Davis v. The State, 14 Texas Ct. App., 645; Gomez v. The State, 15 Texas Ct. App., 327; Darnell v. The State, 15 Texas Ct. App., 70; Smith v. The State, 15 Texas Ct. App., 139; Rhodes v. The State, 17 Texas Ct. App., 579; Jackson v. The State, 18 Texas Ct. App., 586; Johnson v. The State, 18 Texas Ct. App., 385; Bryant v. The State, 18 Texas Ct. App., 107; May v. The State, 21 Texas Ct. App., 595; Henning v. The State, 24 Texas Ct. App., 315; Trimble v. The State, 25 Texas Ct. App., 631.) These decisions have been the law of this State for many years; have met with the tacit sanction and approval of the bar and the Legislature of the State. We shall adhere to them as the established law of the land in cases coming within their purview. We take occasion, however, to suggest to trial judges that they should be exceedingly cautious in murder trials in declining to charge upon murder in the second degree. Instances are comparatively rare in which such a charge may be properly dispensed with. It is only when there is *no* evidence tending to present that issue that such a charge may be safely omitted.

We have not discussed other questions of minor importance presented in the record, because they are of a character not likely to occur on another trial.

Upon the ground before stated the rehearing is granted, the judgment of affirmance is set aside, and the judgment of conviction is reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*

Opinion delivered January 16, 1889.